UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re:                                            Case No. 09-72532

TAJ GRAPHICS ENTERPRISES, LLC,                    Chapter 11

          Debtor.                        Judge Thomas J. Tucker

_____/

## OPINION REGARDING DEBTOR'S
## OBJECTION TO THE CLAIM OF PRIME FINANCIAL, INC.

## I. Introduction

This Chapter 11 bankruptcy case is before the Court on the Debtor's objection to the

claim of Prime Financial, Inc. (Docket # 153, the "Claim Objection"). The Court held a lengthy

evidentiary hearing on the Claim Objection. The Court has considered all of the written and oral

arguments of counsel for the parties; all of the exhibits admitted into evidence during the

evidentiary hearing;[1] and the testimony of all of the witnesses, namely:

Kimberly Peickert
Robert Kattula
Dusica Simovski
Peter Schneiderman
Michelle Levy
Vicky Niemczycki
Dan Sills
Glen O'Connell
Robert Gigliotti
Steven Cohen
Sandra Rieman
Todd Welch
Aaron Jade

---

[1] The many exhibits that were admitted into evidence are listed in the Court's written list, filed
at Docket # 871 (the "Exhibit List"). The Court incorporates that Exhibit List into this opinion by
reference. In this opinion, the Debtor's exhibits will be cited as "DX-_" and Prime Financial, Inc.'s
exhibits will be cited as "PX-_." The Court notes that there is one exhibit missing from the Exhibit List:
DX-B is not listed, but it was admitted into evidence. (*See* Tr. at Docket # 267, at 20).

Seymour Adler
and
Gerald Gabriel

This Opinion states the Court's findings of fact and conclusions of law. For the reasons
stated in this Opinion, the Court will enter an order sustaining the Debtor's Claim Objection in
part, and overruling it in part, and ordering that Prime has an allowed, nonpriority, unsecured
claim in this bankruptcy case in the reduced amount of $1,356,044.45.

## II. Jurisdiction

This Court has subject matter jurisdiction over this contested matter under 28 U.S.C.
§§ 1334(b), 157(a) and 157(b)(1), and Local Rule 83.50(a)(E.D. Mich.). This is a core
proceeding under 28 U.S.C. §§ 157(b)(2)(A), 157(b)(2)(B), and 157(b)(2)(O).

This proceeding also is "core" because it falls within the definition of a proceeding
"arising in" a case under title 11, within the meaning of 28 U.S.C. § 1334(b). Matters falling
within this category in § 1334(b) are deemed to be core proceedings. *See Allard v. Coenen* (*In re
Trans-Industries, Inc.*), 419 B.R. 21, 27 (Bankr. E.D. Mich. 2009). This is a proceeding "arising
in" a case under title 11, because it is a proceeding that "by [its] very nature, could arise only in
bankruptcy cases." *See id.* at 27.

## III. Discussion

## A. Background

The Debtor, TAJ Graphics Enterprises, LLC, referred to in this Opinion as the "Debtor,"
is a Michigan limited liability company that was formed in 1998. At all relevant times, the
Debtor has been managed and controlled by Robert Kattula, its president, and its members have
been members of Robert Kattula's immediate family — his wife Maria Kattula and their children

2

— and/or trusts controlled by Maria Kattula.

Prime Financial, Inc., referred to in this Opinion as "Prime," is a Michigan corporation owned and operated by Aaron Jade. In this Chapter 11 case, Prime filed an amended proof of claim, asserting a nonpriority, unsecured claim for $2,237,000.00. Prime's claim is based on a plan that was confirmed in 2004, in a previous Chapter 11 case filed by the Debtor in 2003. In that prior case, the Debtor's confirmed plan gave Prime an allowed claim for $1.2 million, plus interest, and required the Debtor to pay Prime's claim over a 5-year period. Prime's amended proof of claim in this case is calculated as follows: (1) $1,200,000.00, plus (2) $1,037,000.00 in interest, calculated at the rate of 17% from October 1, 2004 to the petition date in the current case.[2]

The Debtor contends that Prime has no valid claim against it, and seeks disallowance of Prime's claim in its entirety. The Debtor alleges that Prime's claim under the confirmed plan in the Debtor's 2003 bankruptcy case was paid in full. The Debtor advances several theories in support of its payment defense, and these are discussed below.

**B. The Debtor's 2003 bankruptcy case**

The present dispute has roots in the Debtor's first Chapter 11 case. The Debtor filed its first Chapter 11 case in this Court on December 23, 2003, Case No. 03-75414 (the "2003 Case"). In that case, the Debtor proposed, and the Court ultimately confirmed, a Chapter 11 plan. The Debtor's combined plan and disclosure statement was filed on June 30, 2004.[3] (That document

---

[2] DX-E. Prime's amended proof of claim also is on file in the Court's claims register in this case, as Claim No. 7-3.

[3] Docket # 75, 2003 Case; *see also* PX-1.

3

is referred to in this Opinion as the "2004 Plan.") In that document, the Debtor described the 2004 Plan as "a liquidating plan of reorganization."[4] The 2004 Plan was amended by certain written modifications in a document filed by the Debtor on September 1, 2004.[5] (That document is referred to in this Opinion as the "2004 Plan Amendments.") The 2004 Plan as amended by the 2004 Plan Amendments was confirmed, and the Debtor's disclosure statement was given final approval, by an order entered on September 29, 2004.[6]

The 2004 Plan described the Debtor as "a real estate holding company which owns five parcels of industrial property . . . located in Cleveland, Ohio."[7] (The 2004 Plan Amendments later reduced this number of parcels to four.)[8]

In the 2003 Case, Prime was listed in the Debtor's Schedule D, as a junior secured creditor, holding a "2nd position all asset lien," with a claim in the amount of $1.2 million, the "unsecured" portion of which was the entire $1.2 million. The Debtor's Schedule D did not list Prime's claim as being contingent, unliquidated, or disputed.[9] Prime did not file a proof of claim in the 2003 Case, and no one ever objected to Prime's claim in the 2003 Case. As a result, and under then-applicable statutory provisions and bankruptcy rules,[10] Prime had an allowed claim in

---

[4]  *Id.* at 31 (second page of "Disclosure Statement" section of the 2004 Plan).

[5]  Docket # 85, 2003 Case; *see also* PX-2.

[6]  Docket # 99, 2003 Case.

[7]  2004 Plan at 32.

[8]  2004 Plan Amendments at 2, ¶ 7(b).

[9]  Schedule D, p. 3 (Docket # 10 in 2003 Case).

[10]  *See* 11 U.S.C. §§ 1111(a), 501(a), 502(a); Fed. R. Bankr. P. 3003(b)(1), 3003(c)(2). These statutory and rule provisions are the same today as the versions that were in effect in 2003 and 2004, with one immaterial difference in § 1111(a) (the former reference to "section 521(1)" is now a reference to

4

the scheduled amount of $1.2 million in the 2003 Case.

The 2004 Plan treated Prime's claim in Class I. The Plan defined that class as consisting of the "Allowed Secured Claim of Prime Financial."[11] The terms "Allowed" and "Allowed Claim" were defined by the Plan in a way that confirms that the amount of Prime's allowed claim under the Plan was $1.2 million.[12] The 2004 Plan provided that the Debtor would pay the "Prime Financial Indebtedness" in full "on or by five (5) years . . . after the Effective Date of the Plan."[13] The term "Prime Financial Indebtedness" was defined in the 2004 Plan as "the indebtedness owed by the Debtor."

The Plan's "Effective Date" was defined as "the first Business Day after the tenth day after the Confirmation Date," and "Confirmation Date" meant the date of entry of the order confirming the Plan.[14] "Business Day" was defined to exclude weekend days or legal holidays.[15] Because the confirmation order was entered on September 29, 2004, these definitions mean that the "Effective Date" of the confirmed 2004 Plan turned out to be Tuesday, October 12, 2004 (Monday, October 11, 2004 being Columbus Day, a legal holiday).

Thus, the 2004 Plan required that Prime's $1.2 million allowed claim be paid in full no later than 5 years after October 12, 2004 — *i.e.*, no later than October 12, 2009. The 2004 Plan

---

"section 521(a)(1)").

[11] 2004 Plan at 14, § 3.1.

[12] *See id.* at 3, §§ 1.2.3, 1.2.4 (definitions of "Allowed" and "Allowed Claim").

[13] *Id.* at 14, § 3.1.1.

[14] *Id.* at 8, § 1.2.44; 6, §§ 1.2.28, 1.2.21, 1.2.23.

[15] *Id.* at 5, § 1.2.14.

5

contained further requirements regarding the treatment of Prime's Class I, $1.2 million allowed

claim.  It stated:

> 3.1.2.   Payment of the Prime Financial Indebtedness shall
> be accomplished with monthly payments commencing on the first
> Business Day after six months after the Effective Date.
>
> 3.1.3.   The monthly payment to Prime Financial shall be
> calculated based on an amortization of the Prime Financial
> Indebtedness over a period of fifteen (15) years with interest fixed
> at the Interest Rate.
>
> 3.1.4.   Prime Financial shall be granted a Lien against the
> Real Estate to secure the payment of the Prime Financial
> Indebtedness and upon payment of the Prime Financial
> Indebtedness, all Liens shall be released and extinguished.
>
> 3.1.5.   **This Class shall be impaired.**[16]

Putting the above provisions from the 2004 Plan together, then, the Plan required the

Debtor to pay Prime's allowed $1.2 million claim by making monthly payments commencing on

Wednesday, April 13, 2005,[17] in an amount calculated by amortizing the $1.2 million over a 15-

year period, "with interest fixed at the Interest Rate."  As discussed in detail in Part III.C.1 of this

Opinion, the Plan's definition of "Interest Rate" translates to an interest rate on Prime's claim of

17% per annum.  This means that the Debtor's required monthly payments to Prime under the

Plan were roughly $18,000 per month.  But because such monthly payments would not pay off

the entire $1.2 million claim within the Plan's required 5-year payoff period, this implied that a

balloon payment would be due to pay off the Prime claim, no later than the 5-year deadline of

---

[16]  *Id.* at 14-15, §§ 3.1.2 through 3.1.5 (bold emphasis in original).

[17]  This is the date that was "the first Business Day after six months after the Effective Date"
within the meaning of § 3.1.2 of the Plan, quoted above.  (Six months after the Effective Date (October
12, 2004) was April 12, 2005, a Tuesday.  The first Business Day" after that was Wednesday, April 13,
2005.)

October 12, 2009, in the amount of roughly $1.081 million.[18]  In providing for monthly payments for 5 years followed by a balloon payment, as described above, the 2004 Plan did not expressly permit, or prohibit, early payment of the Prime claim.

Some further explanation of the 2004 Plan is required.  In the 2004 Plan as initially proposed, § 3.1.4, quoted above, granted Prime a "Lien against the Real Estate to secure the payment of the Prime Financial Indebtedness."

The 2004 Plan defined "Real Estate" to mean "all real property owned by the Debtor," and the definition further stated that "Real Estate" included, in substance, all of the Debtor's rights relating to such real property, including "[a]ll of the rents, issues, income and profits of the Real Estate," and "equipment . . . in or upon the Real Estate and used or useable in connection with any present or future operation of the Real Estate."[19]

The 2004 Plan, as later amended and confirmed, stated that the Debtor owned four parcels of real estate in Cleveland, Ohio.  These were grouped in two groups of two parcels each, for purposes of disposition under the Plan.  The first group was labeled the "Rockefeller Property" and was "[t]he property commonly known as 2777 and 2779 Rockefeller Drive" in Cleveland.  The second group was labeled the "Transport Property" and was "[t]he property commonly known as 2727 and 2655 Transport Road" in Cleveland.[20]  According to the 2004

---

[18]  These monthly payment and balloon payment numbers assume monthly interest compounding. It may be open to question whether it is correct to use such compounding, in calculating the Debtor's monthly payment amount and 5-year balloon payment amount under the terms of the 2004 Plan.  But given the issues in dispute in this case, that is immaterial.  It is enough at this point to give rough approximations of the amount of the Debtor's required monthly payments to Prime and the Debtor's 5-year balloon payment due to Prime under the Plan.

[19]  2004 Plan at 9-10, § 1.2.54.

[20]  2004 Plan Amendments at 2, ¶ 7.

Plan, the Debtor had leased part of the Transport Property to General Environmental Management, LLC for $4,000.00 per month, and the Debtor had leased the remainder of the Transport Property to Waste Water Management, Inc., for $1,500.00 per month.[21]  Neither the 2004 Plan nor the Debtor's schedules filed in the 2003 Case disclosed anything in particular about any equipment that would fall within the Plan's definition of "Real Estate."[22]

The 2004 Plan stated that K & B Capital, LLC ("K&B") had a first mortgage in the Real Estate, which secured a debt of $2.4 million.  K&B was an entity owned and controlled by Robert Kattula and his family, and K&B had purchased the mortgage debt from Finova Corporation.[23]

Under the 2004 Plan, all of the Debtor's "Real Estate" was to be sold to the highest bidder by means of a pre-confirmation auction.  The first bidder at the auction, and as it turned out, the only bidder, was K&B.  The 2004 Plan provided that K&B's first bid at the auction was in the amount equal to (1) the K&B debt (*i.e.*, a credit bid in the amount of $2.4 million); plus (2) cash or certified funds, defined as the "Qualifying Amount," equal to the greater of $30,000.00 or the amount necessary to satisfy all of the projected and estimated priority claims, including administrative expenses; plus (3) payment to a state-court Receiver, treated in Class III of the Plan, in the amount of $32,000.00; plus (4) assumption of the $1.2 million debt to Prime "in

---

[21]  *See* 2004 Plan at 32, § II.C of the Disclosure Statement; Supplemental Disclosures to Debtor's Disclosure Statement, filed September 15, 2004 (Docket # 94 in the 2003 Case) at ¶ a.

[22]  The only equipment disclosed in the Debtor's Schedule B (Docket # 10 in the 2003 Case) was office equipment ("Desks, Chairs, File Cabinets") valued at $2,000.00.  *See also* 2004 Plan, Ex. A (liquidation analysis listed no equipment other than "Office Furniture" with a "Sale Value" of $2,000.00).

[23]  *See* 2004 Plan at 32-34, § II.C of the Disclosure Statement; Ex. A to 2004 Plan (listing K&B secured claim as $2.4 million and Prime secured claim as $1.2 million).

accordance with the terms set forth in Class I" of the Plan; plus (5) assumption and agreement to pay secured property taxes set forth in Class IV of the Plan, estimated by the Debtor to be $155,027.80.[24]

Under the 2004 Plan as originally proposed, the Debtor's Real Estate was to be sold free and clear of all liens and interests, except secured property taxes and the secured indebtedness owing to Prime under the 2004 Plan. The sale would be subject to those liens, but no others.[25]

Under the 2004 Plan as ultimately modified and confirmed, the provisions regarding the sale of the Real Estate changed. The changes were contained in the "2004 Plan Amendments."[26]

First, at the option of K&B, the successful auction bidder,[27] the sale of the Transport Property was to be made to General Environmental Management, LLC (referred to in this Opinion as "GEM") or any entity designated by GEM, rather than to K&B. But a transfer by the Debtor of the Transport Property to GEM or GEM's designee, rather than to K&B, had to be completed on or before September 30, 2004, unless the Debtor extended that deadline. Real estate taxes were to be paid, but otherwise the sale of the Transport Property was to be free and clear of all liens, with liens being transferred to the sale proceeds.[28]

---

[24] 2004 Plan at 17-18, §§ 4.1-4.3, and 38-39, § VI.B of Disclosure Statement.

[25] *Id.* at 38-39, § VI.B of Disclosure Statement.

[26] Docket # 85 in Case No. 03-75414; *see supra* note 4 and accompanying text.

[27] In the 2004 Plan Amendments, the Debtor stated that the only qualified bidder at the auction was K&B, and that K&B "provided the Qualifying Amount" as required by paragraph 4.3 of the [2004] Plan." Next, the Debtor stated that "[u]pon confirmation of the [2004] Plan, K&B would become the owner of the Real Estate free and clear of all liens and interests in accordance with §363 of the Bankruptcy Code." (2004 Plan Amendments at 2, ¶ 6.)

[28] *See* 2004 Plan Amendments at 3-4, ¶¶ 11-14; Order Approving Disclosure Statement and Confirming Plan of Reorganization, filed September 29, 2004 (Docket # 99 in 2003 Case)(the "Order Confirming Plan") at 2-3, ¶¶ 5-7.

9

Second, the sale of the Rockefeller Property could be made either to K&B, or, at K&B's option, to Water and Wastewater Laboratories, Inc., rather than to K&B. But a transfer by the Debtor of the Rockefeller Property to Water and Wastewater Laboratories, Inc., rather than to K&B, had to be completed on or before September 30, 2004, unless the Debtor extended that deadline. In either case, real estate taxes were to be paid, but otherwise the sale of the Rockefeller Property was to be free and clear of all liens, with liens being transferred to the sale proceeds.[29]

The 2004 Plan was confirmed by a confirmation order filed on September 29, 2004. The confirmation order made clear that the Debtor's Transport Property was to be sold to GEM or its designee, on the "Alternative Closing Date" (*i.e.*, on September 30, 2004), and that the sale was being made under Bankruptcy Code § 363, 11 U.S.C. § 363.[30]

Prime did not object to the 2004 Plan; rather, Prime voted to accept the Plan.[31] Once the Plan was confirmed on September 29, 2004, both the Debtor and Prime were bound by the confirmed Plan, under 11 U.S.C. § 1141(a), and under case law giving the confirmation order *res judicata* effect. *See, e.g., Browning v. Levy*, 283 F.3d 761, 772 (6th Cir. 2002); *see also* discussion in Part III.E.1.a of this Opinion.

**C. Prime's claim in the Debtor's current case**

As to Prime, what emerged from the confirmation of the Debtor's Plan in the 2003 Case

---

[29] *See* 2004 Plan Amendments at 2-4, ¶¶ 8-10, 14.

[30] *See* Order Approving Disclosure Statement and Confirming Plan of Reorganization (Docket # 99 in Case No. 03-75414) at 2-3, ¶¶ 5-8.

[31] Final Report on Tabulation of Votes [etc.], filed August 25, 2004 (Docket # 84 in the 2003 Case).

was that Prime had a claim for $1.2 million plus interest, which had to be paid by the Debtor, according to the 2004 Plan's payment terms. The primary issue now before the Court is whether, and to what extent, if any, Prime's claim was actually paid (or must be deemed paid).

Before discussing the Debtor's various theories as to why Prime's claim should be deemed paid, the Court will address two preliminary issues — namely, the interest rate applicable to Prime's claim; and the burden of proof on the Claim Objection.

**1. The interest rate applicable to Prime's claim, under the 2004 Plan**

Some further explanation is required of the interest rate that applies to Prime's claim under the 2004 Plan. As noted above, the 2004 Plan provided that Prime's $1.2 million claim was to be paid in full during the 5-year period after the Effective Date of the Plan, with interest at the "Interest Rate." The Plan defined "Interest Rate" this way:

> 1.2.35 **"Interest Rate"** means (a) the higher of (i) five (5%) percent, or (ii) the interest being paid or earned on a five (5) year treasury note as published by the Wall Street Journal on the Confirmation Date, (b) the contract rate, or (c) such other interest rate as may be determined by Final Order of the Bankruptcy Court.[32]

Under this definition, there are three possible interest rates. The first of these, under subsection (a) of the definition, is "the higher of (I) five (5%) percent, or (ii) the interest being paid or earned on a five (5) year treasury note as published by the Wall Street Journal on the Confirmation Date." This choice translates to a rate of 5% per annum. That is because that rate was higher than "the interest being paid or earned on a five (5) year treasury note as published by the Wall Street Journal on the Confirmation Date." The "Confirmation Date" was the date on

---

[32] 2004 Plan at 7, § 1.2.35 (bold emphasis and underlining in original).

11

which the order confirming the 2004 Plan was entered,[33] *i.e.*, September 29, 2004.  On that date, the  "interest being paid or earned on a five (5) year treasury note as published by the Wall Street Journal" was 3.375 % per annum.[34]

The second possible interest rate under the 2004 Plan's definition of "Interest Rate" is the "contract rate."  In Prime's case, the "contract rate" was 17% per annum.  It is undisputed that 17% was the non-default interest rate on Prime's loans to K&B that the Debtor had guaranteed,[35] and this is the interest rate that Prime contends applies to its claim.

The third possible interest rate under the 2004 Plan's definition of "Interest Rate" is "such other interest rate as may be determined by Final Order of the Bankruptcy Court."  "Final Order" means, essentially and in pertinent part, "an order of the Bankruptcy Court" that is no longer subject to modification on appeal.[36]  This third choice does not apply, because this Court never entered an order determining that the interest rate applicable to Prime's claim under the 2004 Plan was a rate different than either 5% or 17%.

This leaves two possible choices under the definition of "Interest Rate:" 5% or 17%.  But until the oral closing arguments, made after the conclusion of all the evidence in the very lengthy evidentiary hearing, the Debtor and Prime ***agreed*** that the interest rate applicable to Prime's claim under the 2004 Plan is 17% per annum.  Only during the oral closing arguments did counsel for the Debtor argue, for the first time, that the "Interest Rate" definition in the 2004 Plan

---

[33]  *See* 2004 Plan at 6, §§ 1.2.21 and 1.2.23.

[34]  *See* Wall St. J., Sept. 29, 2004, § C, at C9, C12.

[35]  Jade (Tr. at Docket # 755) at 38-39.

[36]  *See* 2004 Plan at 7, § 1.2.30.

is ambiguous, and might not mean 17%. But the Court rejects that belated argument, and finds that the interest rate applicable to Prime's claim under the 2004 Plan is 17% per annum. This is so for the following reasons.

Prime's amended proof of claim filed in this case, which is the subject of the Claim Objection, is clearly and explicitly based on the 2004 Plan's provisions, and is for $1.2 million plus interest calculated at the contract interest rate of 17%. In objecting to that amended claim, the Debtor never disputed that the applicable interest rate under the 2004 Plan is the contract rate of 17%, until after the evidence closed in the very long evidentiary hearing.

Nor did the Debtor's attorney, or any witness, ever dispute or question the 17% interest rate during the course of the evidentiary hearing. During the evidentiary hearing, Prime's President, Aaron Jade, testified to his understanding that the applicable interest rate under the 2004 Plan is 17%.[37] And while cross-examining Jade, the Debtor's attorney expressly ***admitted*** that the applicable interest rate under the 2004 Plan is 17%. In cross examining Jade about the accrued interest component of Prime's amended proof of claim (DX-E, second page), the Debtor's counsel asked the following questions and made the following statements:

> Q  The accrued interest at 17%, that's just a plug number on 1.2 million, right?
>
> A  Yes.
>
> Q  I mean the simple product.
>
> A  Correct.
>
> Q  Okay. Why is that?

---

[37]  Jade (Tr. at Docket # 755) at 34-35, 66.

A  Because the [2004 P]lan had a definition of interest rate and it was the higher of three different items and I think we used --

Q  **No, no, no. Let me interrupt you. I agree with you, it's 17% under the [2004 P]lan.** I guess I'm trying to figure out how come it's 17% on 1.2 million from and after October 1, '04. Weren't there pay downs on these obligations?[38]

Finally, in the Debtor's two closing briefs, filed after the close of the evidence, the Debtor never disputed or questioned the 17% interest rate.[39]

After the close of the evidence, and after the parties had filed their closing briefs, the Debtor obtained a new attorney, who then argued during the oral closing argument that the 2004 Plan is ambiguous and that the 17% rate might not apply to Prime's claim.  But even while making that argument, the Debtor's new counsel did not dispute that the evidence pointed only to a 17% interest rate:

> The [2004 P]lan afforded a claim in favor of Prime Financial in the amount of 1,200,000. . . . The [2004 P]lan provided for interest on that claim but did not specify whether that interest rate would be 5% or the rate of interest provided in the underlying loan documents.  Nor did the [2004 P]lan provide a mechanism for selecting the [interest] rate.
> . . .
>
> **The parties also apparently assumed that the interest rate was 17% per annum.**
> . . .
>
> The interest rate is ambiguous in the [2004 P]lan . . .
> . . .
>
> The [2004 P]lan says in the . . . definitional section that the interest rate is A, the higher of 5% or a prime rate.  B, the contract rate.  Or

---

[38]  *Id.* at 66-67 (emphasis added).

[39]  Docket ## 892, 910.

C, such other interest rate as the Court may determine. I'm paraphrasing that.

. . .

THE COURT: And so it doesn't say which one applies.

MR. MORRIS: It doesn't say which one applies.

. . . But there is this ambiguity. **The 17% rate that the creditor contends is the contract rate. And there is evidence of that. That was the contract rate.**

. . .

**THE COURT: The 17% was the contract rate on the loans, the various loans that TAJ had guaranteed before the – the confirmation of the [2004 P]lan in the first bankruptcy case, is that right?**

**MR. MORRIS: That's my understanding and I believe that's what the evidence indicates.**

. . .

**THE COURT: Well, are the parties -- in your view are the parties in agreement? Maybe you've already alluded to this, but are the parties in agreement or have they been at least that -- till now they've been in agreement that the interest rate under the -- for the [2004 P]lan debt of 1.2 million is 17%?**

**MR. MORRIS: Seventeen percent.**

**THE COURT: Is that right?**

**MR. MORRIS: I think -- I did not see testimony to the contrary.**

**THE COURT: My question is, do -- do the parties agree on it? Obviously Prime says it's 17%, it's in their proof of claim. Does the Debtor agree?**

MR. MORRIS: I'm not prepared to stipulate to that, but **I did not see evidence that contradicted that in my review of the transcripts.**

. . .

**THE COURT: And is it also -- by the way is it also fair to say**

15

> that at least before today the [D]ebtor has never argued or
> alleged in objecting to Prime's claim that the interest rate, the
> appropriate interest rate on this [2004 P]lan debt was not
> 17%?
>
> **MR. MORRIS: I didn't see it. I did not see that issue raised**. . .
> . And again if the [D]ebtor did that -- I'm not waiving anything
> because I'm -- I'm not in a position, not in such a command of the
> facts in the -- in the entire case to be able to waive or confirm
> something like that. But I didn't see it.[40]

This belated argument about the interest rate was forfeited by the Debtor, (1) because it came much too late and after the close of the evidence in this very lengthy evidentiary hearing, and (2) because the Debtor actually admitted during the evidentiary hearing, through its counsel, that the applicable interest rate is 17%.

In addition, this belated argument by the Debtor would fail even if it were not forfeited. The Court finds that even if the 2004 Plan's definition of "Interest Rate" is ambiguous, as applied to the 2004 Plan's treatment of Prime's $1.2 million claim, such ambiguity is eliminated by the evidence presented, including the testimony of Prime's Aaron Jade, and the admission of the Debtor's counsel, quoted above. And such evidence shows that the parties have understood the applicable interest rate to be the "contract rate" of 17% per annum. Moreover, of the two possible choices of interest rate under the 2004 Plan — 5% or the contract rate of 17% — it is more reasonable to assume that the Debtor and Prime each intended that the rate be 17%, since that was the consistent and well-established contract rate for all of Prime's loans to K&B that the Debtor had guaranteed. By contrast, the rate of 5% bore no relation whatsoever to the course of dealing between Prime, K&B, and the Debtor.

---

[40] Tr. at Docket # 922, at 5, 29-32, 37-38 (emphasis added).

16

## 2. The Debtor's burden of proof

Prime's claim in this case is before the Court on Prime's amended proof of claim.[41] Under Fed. R. Bankr. P. 3001(f), "[a] proof of claim executed and filed in accordance with these rules shall constitute prima facie evidence of the validity and amount of the claim." As relevant here, "these rules," as that phrase is used in Rule 3001(f), include the following parts of Fed. R. Bankr. P. 3001: Rule 3001(a), which requires that a proof of claim "conform substantially to the appropriate Official Form;" Rule 3001(b), which requires that a proof of claim "be executed by the creditor or the creditor's authorized agent;" and Rule 3001(c)(1), which requires, with certain exceptions not applicable here, that "when a claim . . . is based on a writing, a copy of the writing shall be filed with the proof of claim."

Prime's amended proof of claim meets the requirements of Rule 3001(a) and 3001(b), in that it conforms substantially with the appropriate Official Form that was in effect when the proof of claim was filed, and the proof of claim was signed by Prime's authorized agent, namely, Prime's attorney. But Prime's amended proof of claim does not meet the requirement of Rule 3001(c)(1), because the claim is based on one or more writings that were not attached to the proof of claim — *i.e.*, the documents making up the Debtor's confirmed Plan in the 2003 Case (the 2004 Plan, the 2004 Plan Amendments, and the Order Confirming Plan). This is a technical, non-material violation of Rule 3001(c)(1), however, because the missing documents all are on file with this Court in Case No. 03-75414, as a matter of public record.

Nonetheless, because of Prime's failure to comply with Rule 3001(c)(1), Prime's proof of claim is *not* "prima facie evidence of the validity and amount of" Prime's claim, under Rule

---

[41] DX-E, which is filed in the Court's claims register for this case as Claim 7-3.

3001(f). But as it turns out, that does not matter in this case, because the "lack of prima facie validity" under Rule 3001(f) "simply means that the claimant must submit evidence establishing its right to payment from the debtor." *In re Leverett*, 378 B.R. 793, 802 (Bankr. E.D. Tex. 2007) (citation omitted). In the extensive evidentiary hearing held in this case, Prime met its burden of submitting ample evidence in support of its claim.

Even if Prime's amended proof of claim was sufficient to constitute "prima facie evidence of the validity and amount of" Prime's claim, that would mean only that the Debtor, as the party objecting to the claim, "ha[d] the burden of going forward in contradicting the claim." *In re Promedco of Los Cruces*, 275 B.R. 499, 503 (Bankr. N.D. Tex. 2002) (citations omitted). Or, as one case puts it, when there is prima facie validity, "[t]he claimant will prevail unless the objecting party produces evidence at least equal in probative force to that offered by the proof of claim and which, if believed, would refute at least one of the allegations that is essential to the claim's legal sufficiency." *Leverett*, 378 B.R. at 799 (citations omitted).

Thus, when the prima facie presumption does not apply to a proof of claim, the result is the same as when the presumption applies but is adequately rebutted by evidence. The result is that "whichever party would have the burden of proof respecting the claim outside of bankruptcy bears that same burden in bankruptcy." *See id.* (citations omitted).

In this case, even if Prime's amended proof of claim did constitute prima facie evidence of the claim's validity and amount, under Rule 3001(f), the Debtor presented sufficient evidence to rebut such prima facie evidence, such that any presumption in favor of Prime's claim falls away. This means that the normal burdens of proof placed on the parties by substantive law apply to Prime's claim and to the Claim Objection.

18

The Debtor's objection to Prime's claim is in the nature of a defense of *payment*. The Debtor does not dispute that Prime had a valid claim based on the confirmed 2004 Plan in the Debtor's 2003 Case. But the Debtor alleges, based on several different theories, that Prime's claim was paid in full, or must be deemed paid in full. Under Michigan law, such a defense of *payment* is an affirmative defense, on which the party asserting the defense bears the burden of proof. *See, e.g., In re Dunneback's Estate*, 4 N.W.2d 472, 474 (Mich. 1942); *Smith v. Smith*, 247 N.W. 106 (Mich. 1933); *Estate of Degoede by Trader v. Comerica Bank*, No. 339577, 2018 WL 3998764, at *3 (Mich. Ct. App. Aug. 21, 2018); Mich. Ct. R. 2.111(F)(3)(a). Michigan law applies here, because the confirmed 2004 Plan says so.[42] But even if federal common law governed Prime's claim, rather than Michigan law, the same rule applies — the burden of proving the defense of payment is on the debtor asserting the defense. *See, e.g., Accelerated Int'l Forwarders, LLC v. United States*, No. 09-819C, 2011 WL 636416, at *6 (Fed. Cl. Feb. 22, 2011) (citations omitted) (the defense of payment, asserted by the defendant against a breach of contract claim, is an affirmative defense on which such defendant bears the burden of proof); Fed. R. Civ. P. 8(c)(1) (requires parties to plead "any avoidance or affirmative defense, including . . . payment").

Thus, the Debtor has the burden of proving its defense of payment, by a preponderance of

---

[42] The 2004 Plan states:

> 1.5 **GOVERNING LAW** Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules), the laws of the . . . State of Michigan shall govern the construction and implementation of the Plan and any agreements, documents and instruments executed in connection with the Plan.

2004 Plan at 12, § 1.5.

the evidence.  *See generally Leverett*, 378 B.R. at 799 (quoted above).

This conclusion is further compelled by the United States Supreme Court's decision in *Raleigh v. Illinois Dep't of Revenue*, 530 U.S. 15 (2000).  In that case, the Supreme Court held that on a claim objection in a bankruptcy case, the burden of proof is the same as what it would be under applicable law outside of bankruptcy.  The burden of proof established by non-bankruptcy law applies, the Court held, because the burden of proof is part of the substantive law governing the claim.  *See* 530 U.S. at 17, 20-21.

In *Raleigh*, a Chapter 7 trustee objected to a claim by the State of Illinois for an unpaid use tax allegedly owed by the debtor, as a responsible officer of a non-debtor corporation.  The state's tax code placed the burden of proof on the responsible officer of the taxpayer, in order to avoid personal liability for the corporation's tax debt.  The state law required the officer to prove that he did *not* meet one of the two statutory requirements for liability.  Those requirements were that the corporate officer had "the control, supervision or responsibility of filing returns and making payment of the amount of" the tax at issue; and that the officer "willfully fail[ed] to file the return or make the payment."  530 U.S. at 18.  Under Illinois law, the corporate officer bore the burden of proof to negate at least one of those elements, in order to avoid liability.

The Supreme Court held that in objecting to the state's claim, the Chapter 7 trustee had the same burden of proof that the debtor would have had outside of bankruptcy.  The Court noted that "[t]he 'basic federal rule' in bankruptcy is that state law governs the substance of claims." 530 U.S. at 20 (citation omitted).  And the Court held that "[g]iven its importance to the outcome of cases, we have long held the burden of proof to be a 'substantive' aspect of a claim.  That is, the burden of proof is an essential element of the claim itself; one who asserts a claim is entitled

to the burden of proof that normally comes with it." *Id.* at 20-21 (citations omitted).[43]

In this case, the creditor, Prime, has met its burden of proof with respect to its amended proof of claim in this case, except for a minor adjustment that is needed to the interest component of Prime's claim. Interest on the $1.2 million claim amount did not begin to accrue on October 1, 2004, as Prime's claim assumes. Rather, the interest began to accrue on the Effective Date of the 2004 Plan, which was October 12, 2004. And as Prime's claim calculates, such interest accrued at the rate of 17% per annum, to the date on which the Debtor filed its petition in the present case (October 21, 2009).[44] Using these parameters, the Court calculates that the interest component of Prime's claim in this case is $1,025,030.14, which is slightly lower than the $1,037,000.00 interest amount in Prime's claim.[45] Thus, Prime has met its burden of

---

[43] The Supreme Court noted that the Rules of Bankruptcy Procedure, including Rule 3001, "are silent on the burden of proof for claims." 530 U.S. at 22 n.2. And the Court noted specifically that Rule 3001(f) "does not address the burden of proof when a trustee disputes a claim." *Id.*

[44] Prime's interest calculation assumes that Prime is not entitled to any post-petition interest on its claim in this case. This assumption appears to be correct, because even though the confirmed 2004 Plan purported to give Prime a lien in the Debtor's "Real Estate" to secure payment of Prime's claim, such real estate was sold, and there is no evidence that the Debtor still had any proceeds of such sales as of the petition date in this case. So Prime is an unsecured creditor in this case, and acknowledges as much in its amended proof of claim. As an unsecured creditor, Prime has no right to any post-petition interest on its claim in this case. *See* 11 U.S.C. §§ 502(b)(2), 506(b); *Thompson v. Kentucky Lumber Co.* (*In re Kentucky Lumber Co.*), 860 F.2d 674, 676 (6th Cir. 1988) ("The general rule of actions in bankruptcy is that unsecured creditors are not entitled to post-petition interest upon their allowable claims."). Rather, interest stops accruing as of the petition date. *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 246 (1989); *In re Fesco Plastics Corp., Inc.,* 996 F.2d 152, 155 (7th Cir. 1993).

[45] This interest calculation assumes that the 17% interest rate is simple interest, without any compounding. This is a correct assumption, under the terms of the confirmed 2004 Plan in the Debtor's 2003 Case. And Prime implicitly acknowledged this in its amended proof of claim, in which Prime calculated the interest it claims as simple interest, with no compounding. This is obvious from the numbers. Using Prime's assumption that interest began to run on October 1, 2004, rather than on October 12, 2004 as the Court has found, the total interest, using simple interest on Prime's $1.2 million claim, with no compounding, is $1,031,178.08 (slightly lower than Prime's interest total of $1,037,000.00). But if there was annual compounding in the interest calculation, Prime's total interest calculation would be $1,456,670.38, much higher than what Prime's amended claim calculates.

21

proving, by a preponderance of the evidence, that it has an allowable claim in this case of $2,225,030.14. And Prime contests the Debtor's allegations that its claim was paid. Prime contends that nothing was ever paid on its claim, and has presented evidence to that effect.[46]

Under these circumstances, the Debtor has the burden of proving payment, by a preponderance of the evidence. Prime's claim is subject to possible reduction, as to principal and/or interest, if and to the extent the Debtor has met its burden of proving its affirmative defense of payment.

**D. The Debtor's allegation that Prime's $1.2 million allowed claim in the Debtor's 2003 Case and under the 2004 Plan was paid in full in early October 2004, shortly after confirmation of the 2004 Plan**

As noted above, Prime had a $1.2 million claim that was allowed in the Debtor's 2003 Case, and that the Debtor's 2004 Plan required to be paid in full with interest no later than 5 years after the Plan's Effective Date (*i.e.*, no later than October 12, 2009). The Debtor's first theory for disallowing Prime's claim in the current Chapter 11 case is that Prime's $1.2 million claim was paid in full in early October 2004, shortly after the Debtor's 2004 Plan was confirmed. Prime disputes this theory, and contends that nothing has ever been paid on its claim from the 2003 Case.

The facts alleged by the Debtor in support of its theory are complex. For these facts, the Debtor relies primarily on the testimony of its President, Robert Kattula and of his bookkeeper and assistant, Dusica Simovski, and on several documents that were admitted into evidence.

---

[46] During the evidentiary hearing, Prime presented testimony that no amount was ever paid on Prime's claim by or on behalf of the Debtor. (*E.g.*, Testimony of Sandra Rieman ("Rieman") (Tr. at Docket # 617) at 59, 65; Testimony of Seymour Adler (Tr. at Docket # 819) at 96; Testimony of Gerald Gabriel (Tr. at Docket # 870) at 102**).** And Prime presented evidence contradicting every one of the Debtor's various theories of payment.

Before the Debtor filed its 2003 Case on December 23, 2003, it had guaranteed two loans

that Prime made to K&B. The first loan, which the Court will refer to in this Opinion as the

"K&B Cleveland loan" (a name used by the parties for that loan), was made by Prime to K&B in

2001, originally in the amount of $525,000.00, and had been refinanced in 2003, at which time

Prime loaned another $900,000.00 to K&B. Thus, the total principal amount of the K&B

Cleveland loan was $1.425 million. The second loan, which the Court will refer to in this

Opinion as the "Luna Pier loan" (also a name used by the parties for that loan), was made by

Prime to K&B in 2002, in the principal amount of $1.25 million.[47]

When the Debtor filed its 2003 Case, its only debt to Prime was based on its having

guaranteed K&B's repayment of the K&B Cleveland loan and the Luna Pier loan. (The Debtor

itself had never borrowed money from Prime.)[48] Although the principal of these two guaranteed

---

[47] Testimony of Robert Kattula ("Kattula") (Tr. at Docket # 267) at 6-7; Testimony of Dusica Simovski ("Simovski") (Tr. at Docket # 295) at 143, 145, 147; DX-G; PX-9; PX-13). The K&B Cleveland loan was evidenced by, among other documents, a note entitled "Consolidated, Restated and Amended Promissory Note," dated August 21, 2003, in the amount of $1.425 million, signed by Kattula on behalf of K&B. (PX-13; Kattula (Tr. at Docket # 291) at 84, 85, 86; Testimony of Peter Schneiderman ("Schneiderman") (Tr. at Docket # 387) at 14-16). There are two Guaranty Agreements under which the Debtor guaranteed K&B's payment of that debt to Prime. The first of these is dated December 18, 2001, and is part of PX-212 (at Bates page 002395). (Jade (Tr. at Docket # 682) at 46-47). A copy of the second Guaranty Agreement, dated August 19, 2003, is part of PX-13.

The Luna Pier loan was evidenced by, among other documents, a $1.25 million note entitled "Promissory Note," dated September 30, 2002, signed by Kattula both individually and on behalf of K&B. (PX-9; Schneiderman (Tr. at Docket # 387) at 11, 13). The Luna Pier loan was secured by a mortgage in the Luna Pier real estate owned by K&B, and by a security interest given by K&B's personal property. (Schneiderman (Tr. At Docket # 387) at 13; PX-10, PX-11). The Debtor guaranteed K&B's payment of the Luna Pier loan under, among other documents, the August 19, 2003 Guaranty Agreement referred to above (PX-13).

[48] See, e.g., Testimony of Michelle Levy ("Levy") (Tr. at Docket # 414) at 77-78. Prime contends that the Debtor guaranteed other loans, in addition to the K&B Cleveland loan and the Luna Pier loan. But as the Court explains in more detail in Part III.E.1.a of this Opinion, the Court rejects Prime's argument, and finds that the Debtor guaranteed only the K&B Cleveland loan and the Luna Pier loan.

loans totaled $2.675 million, Kattula testified that he negotiated an agreement during the 2003 Case with Prime's President, Aaron Jade ("Jade"), that Prime's allowed claim against the Debtor would be only $1.2 million.[49] And, as noted above, this is the amount of Prime's allowed claim under the 2004 Plan.

The Debtor claims that Prime's claim was paid in full by two wire transfers that were made to Prime in early October 2004. These two wire transfers are discussed separately below.

**1. The October 1, 2004 wire transfer of $1.8 million from GEM to Prime**

**a. The alleged assignment of assets by K&B to the Debtor on October 1, 2004**

As noted above, the Debtor's 2004 Plan was confirmed on September 29, 2004. Two days later, on October 1, 2004, Kattula caused a wire transfer to be made to Prime by a third party (discussed below), in the amount of $1,813,228.85.[50] It is undisputed that, among other things, this payment to Prime paid off the K&B Cleveland loan, in the total amount then due of $1,235,491.12.[51] And on October 4, 2004, Prime sent a refund of part of this payment, by wiring to K&B the amount of $471,710.44.[52] Thus, out of this $1.813 million wire transfer it received, Prime retained a total of $1,341,518.41. This included the $1,235,491.12 payoff of the K&B Cleveland loan that K&B owed and that the Debtor had guaranteed, plus $106,027.29 that Prime

---

[49] Kattula (Tr. at Docket # 267) at 8-9; Kattula (Tr. at Docket # 283) at 4, 5.

[50] Kattula (Tr. at Docket # 267) at 13.

[51] Kattula (Tr. at Docket # 267) at 25-26; *see also* DX-B; PX-6; Kattula (Tr. at Docket # 275) at 33, 45; Simovski (Tr. at Docket # 303) at 34-35; PX-24 (June 6, 2006 letter from Prime's Aaron Jade to Robert Kattula, stating that the "K&B Cleveland" note was "paid off in 2004"); PX-43 (May 10, 2005 Agreement to Extend Promissory Notes — list of then-outstanding notes does not include K&B Cleveland loan/note, thereby indicating that it had been paid off); Levy (Tr. at Docket # 414) at 78.

[52] Kattula (Tr. at Docket # 267) at 16; DX-B; PX-6; PX-7; Jade (Tr. at Docket # 682) at 58-60.

applied to other debts owing to it from K&B.[53]

It is undisputed that the third party who wired the $1.813 million to Prime on October 1, 2004 was GEM. As noted above, the Debtor had leased part of its Transport Property in Cleveland to GEM, and the 2004 Plan, as modified and confirmed, provided for Debtor to sell the Transport Property to GEM. The $1.813 million amount represented GEM's payoff, owed to K&B, on a $1.95 million promissory note GEM had made in favor of K&B in July 2003.[54] Kattula had directed GEM to pay the $1.813 million to Prime, to be applied as payments on K&B's debts to Prime.[55]

GEM's $1.95 million promissory note to K&B had been given as part of a settlement made in July 2003. The terms of the settlement are contained in a written settlement agreement dated July 30, 2003, which incorporated and supplemented a letter agreement dated June 20, 2003.[56] The numerous named parties to the settlement agreement included K&B, the Debtor,

---

[53] *See* DX-B; PX-6; Jade (Tr. at Docket # 682) at 58-60.

[54] PX-3; PX-4; PX-5; PX-29; Kattula (Tr. at Docket # 295) at 58 (admitting that this note was payable to K&B, not the Debtor); *see* PX-47. Initially, one copy of the document that is a copy of the GEM $1.95 million promissory note was not admitted into evidence. (PX-44; *see* Tr. at Docket # 295 at 24, 25-26 (Court denied admission of PX-44, after Kattula denied that PX-44 was a copy of such note). But another copy of that Note was later admitted into evidence, as an attachment to PX-68, a document by which K&B assigned the Note to Prime, on August 21, 2003. That exhibit was admitted into evidence. (*See* Tr. (Docket # 354) at 51; *see also* discussion in Part III.D.3 of this Opinion, below).

The GEM $1.95 million promissory note was part of the collateral given by K&B in August 2003 to secure payment to Prime of the $1.425 million K&B Cleveland loan. (*See* PX-13 at second page (page 2 of August 21, 2003 promissory note), and at seventh page (page 1 of security agreement); Kattula (Tr. at Docket # 291) at 105-06).

[55] Kattula (Tr. at Docket # 275) at 43.

[56] Copies of these documents are contained in PX-3. Kattula testified that there was a later settlement agreement that "superseded" this July 30, 2003 settlement agreement, but he never produced an original or a copy of it, or any written evidence of it. (*See, e.g.*, Kattula (Tr. at Docket # 354) at 49-50. And Jade credibly testified that there was only one settlement agreement — the one

25

Kattula, GEM, and Prime.

The Debtor had disclosed some of the terms of this settlement agreement in the 2004 Plan Amendments, filed in the 2003 Case on September 1, 2004.[57] In that document, the Debtor stated:

> GEM is obligated pursuant to a certain Settlement Agreement and Mutual Release to pay to K&B $1,950,000. A copy of the Settlement Agreement and Mutual Release has been filed with the Court and is available for review by any party in interest. . . . Pursuant to the agreement by the parties, GEM has an option to purchase the Transport Property from the Debtor for $500,000 provided that the foregoing obligation has been paid. The Plan provides for an assumption of all executory contracts provided that such executory contracts are not subject to an application to reject. The Debtor does not anticipate filing any motion to reject any contract with GEM and to the extent that the Debtor is a party to the Settlement Agreement and Mutual Release, it is the Debtor's intention to assume same.[58]

The Debtor claims that *all* of the $1,341,518.41 that Prime received and retained from the October 1, 2004 wire transfer from GEM, which included the $1,235,491.12 payoff of the K&B Cleveland loan, should be deemed to be a payment *by the Debtor* to Prime of Prime's $1.2 million claim under the 2004 Plan.[59] This is because, according to the Debtor, all of the money wired to Prime on October 1, 2004 was property of the Debtor, rather than property of K&B. This, in turn, is because according to the Debtor, on October 1, 2004, K&B assigned to the Debtor all of K&B's assets, including the right K&B had to receive payment under the GEM

---

reflected in the documents in PX-3. (Jade (Tr. at Docket # 675) at 90).

[57] *See* 2004 Plan Amendments at 4, ¶ 15; *see also* PX-2 at 4, ¶ 15.

[58] *Id.*

[59] *See, e.g.*, Kattula (Tr. at Docket # 275) at 45-46.

promissory note.[60]

Prime disputes that any such assignment was done on October 1, 2004 as claimed by the Debtor, rather than much later, if at all.

This assignment was done, according to the Debtor, by a one-page document entitled "Assignment" that the Debtor says Kattula signed on October 1, 2004. According to the testimony of both Kattula and the Debtor's bookkeeper, Simovski, this "Assignment" document was prepared by Joseph Ostrowski,[61] who at the time was the in-house attorney for K&B, the Debtor, and Kattula, and it was signed by Kattula on October 1, 2004. Simovski testified that she signed this document as a witness, after watching Kattula sign it, on October 1, 2004.[62] Kattula testified that he sent a copy of this assignment document to Prime's President Jade in October 2004.[63] But Jade disputes this, and testified that he never saw or learned of this purported assignment document until late 2007 or 2008.[64]

Although the Assignment document allegedly was drafted by an attorney, it contains a number of apparent typographical errors, an incomplete sentence, and some odd and ungrammatical wording. The Assignment document states, in its entirety, the following, and contains handwritten signatures on both of the signature lines:

---

[60] Kattula (Tr. at Docket # 267) at 14, 15, 23-24.

[61] Joseph Ostrowski did not testify during the evidentiary hearing.

[62] Kattula (Tr. at Docket # 267) at 10, 11; Kattula (Tr. at Docket # 283) at 11-12; Kattula (Tr. at Docket # 295) at 6; Simovski (Tr. at Docket # 295) at 130-31, 132; Simovski (Tr. at Docket # 303) at 33.

[63] Kattula (Tr. at Docket # 283) at 37.

[64] Jade (Tr. at Docket # 675) at 95-96; Jade (Tr. at Docket # 695) at 25, 28, 51; Jade (Tr. at Docket # 784) at 93-94.

27

ASSIGNMENT

THIS ASSIGNMENT made this 1st day of October, 2004, by and between K&B Capital, LLC, a Michigan Liability Company, whose address is 691 North Squirrel Road, Auburn Hills, Michigan 48326 ("Assignor"), and TAJ Graphics, Enterprises, LLC in Michigan limited liability company whose address is 4306 Brightwood, Troy Michigan 48085 ("Assignee"):

WITNESSETH, that for valuable consideration of Six Hundred Eighty One Thousand Dollars ($681,000.00) in hand paid by or on behalf of the Assignee, receipt of which is hereby acknowledged, the Assignor hereby assigns and transfers to the Assignee all of his right, title and interest in and to any and all chooses in actions, lawsuits, collections, judgments and any and all claims (hereinafter "claims"), ever existing, in whatever form either known or unknown. As set forth that certain Purchase, Sale or Operating Agreements. Provided, however, no warranties of any kind whatsoever are made incident to this Assignment.

WHEREAS, it is the intent of this Assignment is to transfer to Assignee full power to legally pursue certain known and unknown claims, Assignor does hereby appoint Assignee his attorney in fact, with full authority to enforce the herein assigned, and to collect and receive the judgments, as Assignor would do if this Assignment were not being made. Any costs incurred by the Assignee in enforcing the claims, shall be borne by the Assignee TAJ Graphic Enterprises, LLC.

IN WITNESS WHEREOF, the Assignor has executed this Assignment on the day and year first above written.

Signed, sealed and delivered: _____

                                     Robert T. Kattula

in the presence of Dusica Simovski:

Witness: _____ [65]

The above Assignment document recites that the Debtor had paid K&B $681,000.00, in

---

[65] DX-A.

exchange for the assignment of the K&B assets to the Debtor. Kattula testified about how the Debtor paid that $681,000.00 to K&B. He testified that the $681,000.00 consists of two parts. The first part is the $471,000.00 refund from Prime, out of the October 1, 2004 $1.8 million wire transfer to Prime, discussed above, which Kattula says he caused Prime to pay to K&B.[66] The second part of the $681,000.00, according to Kattula, is $210,000.00 in net proceeds that resulted from the Debtor's sale of its Rockefeller Property in Cleveland, to a company called "Hagel." (As discussed above, the 2004 Plan contemplated the sale of the Rockefeller Property). Kattula says that he caused this $210,000.00 to be paid to K&B. According to Kattula, the $471,000.00 plus the $210,000.00 equals the total of $681,000.00 that the Assignment document says the Debtor paid to K&B for the K&B assets.[67]

The Court rejects the Debtor's theory, based on the alleged October 1, 2004 Assignment document, that the October 1, 2004 wire transfer payment to Prime was a payment by the Debtor to Prime. Rather, the Court finds that such payment was, in its entirety, a payment by K&B to Prime. No part of the payment can be deemed to have come from, or been made on behalf of, the Debtor. The payment represented payment on a debt that GEM owed to K&B. And the Court finds that when the October 1, 2004 wire transfer was made to Prime, there had not yet been any assignment of any of K&B's assets to the Debtor, under the alleged Assignment document or otherwise. The Court makes these findings for the following reasons.

**First,** the Court finds that the alleged Assignment document was ***not*** signed by either Kattula or the witness, Simovski, on October 1, 2004, but rather, it was signed at a much later

---

[66] Kattula (Tr. at Docket # 267) at 27, 28; Kattula (Tr. at Docket # 267) at 69-70.

[67] Kattula (Tr. at Docket # 267) at 14, 16; Kattula (Tr. at Docket # 275) at 27, 28, 38.

date. The Court finds that the testimony of Kattula and Simovski on this point is not credible; the Court does not believe it. This is so for a number of reasons, including the following:

• The credibility of the testimony of both Kattula and Simovski about the alleged Assignment document was undermined by the wording of the Assignment document. That wording strongly indicates that the document was not drafted by any attorney, contrary to the testimony of both Kattula and Simovski that it was drafted by attorney Ostrowski. Many of the reasons why this is so were summed up well during the evidentiary hearing by Prime's counsel, as follows:

> [A] simple review of that assignment will reveal that this is not a document that appears to have been drafted by an attorney. And the reasons are as follows. The assignment is between K & B Capital, LLC and TAJ Graphics Enterprises, LLC. But the document goes on to say that the document assigns all of his rights, not its rights, but his rights, title, and interest in -- in and to any and all chooses of action, C-h-o-o-s-e-s lawsuit, collections, judgments, and any and all claims ever existing in whatever form either known or unknown as set forth in that certain purchase sale or operating agreement. It goes on in Paragraph C . . . to say that the assignor does hereby appoint assignee his attorney in fact. This document is signed by Mr. Kattula personally and -- and not in any capacity as being either on behalf of the assignee or the assignor. **This document is clearly copied by somebody who perhaps doesn't really know what they're looking at from some other document**.[68]

As mentioned by Prime's counsel during this argument just quoted, the second paragraph of the document contains a sentence that is not a complete sentence, but which refers to the assignment as being "As set forth that certain Purchase, Sale or Operating Agreements." The Court notes that not only is this an ungrammatical and incomplete sentence, but also that during the long

---

[68] Tr. (Docket # 354) at 83-84 (oral argument of Prime's counsel) (emphasis added).

evidentiary hearing, the Debtor never produced or offered into evidence any "Purchase, Sale or Operating Agreements" that evidence, mention, or have anything to do with this alleged assignment of assets by K&B to the Debtor. Nor did the Debtor ever assert that there were any such agreements.

From the wording of the Assignment document, the Court finds that the document obviously was not drafted by attorney Ostrowski, or by any other attorney. Rather, this document must have been clumsily cobbled together by either Kattula or Simovski, by copying and pasting from other agreements that had been done in the past by Kattula or one or more of Kattula's businesses.[69] The significance of this, in turn, is that the Court must conclude that both Kattula and Simovski lied in their testimony about the alleged Assignment document, when they both testified that attorney Ostrowski had drafted the document. This destroys the credibility of both of these witnesses, with respect to *all* of their testimony about the alleged October 1, 2004 Assignment document.

The testimony of Kattula and Simovski that the Assignment document was drafted by attorney Ostrowski is undermined by a further, more subtle, but very telling fact. As noted above, the Assignment document recited that the consideration given by the Debtor in exchange for the assignment of K&B assets was the Debtor's payment of $681,000.00. Of this amount, Kattula testified, $471,000.00 came from the $471,000.00 refund from Prime, out of the October

---

[69] The evidence shows that Kattula had Simovski, a non-lawyer, draft legal documents for him and the Debtor. For example, Simovski testified that Kattula had her draft a mortgage signed January 9, 2007 and recorded November 14, 2007, in which DA Enterprises, LLC purportedly gave the Debtor a mortgage in the Luna Pier real estate. (PX-158; Simovski (Tr. At Docket # 617) at 74-75). Simovski testified that she drafted this mortgage "off the templates from the attorneys that I have." (*Id.* at 75). Even though Simovski drafted this document, it states that it was drafted by "John Valente, Jr., Trustee." *Id.*; PX-158). Valente was, at that time, the trustee for the Kattula's children's trust. (Simovski (Tr. at Docket # 617) at 75.)

1, 2004 $1.8 million wire transfer to Prime, discussed above, which Kattula says he caused Prime to pay to K&B. But this $471,000.00 was the property of K&B to begin with, not the Debtor. It only ever became property of the Debtor, if at all, by virtue of the Assignment document itself. This is so because, as discussed above, the $1.8 million wire transfer was made by GEM to Prime in payment of GEM's debt under its promissory note *to K&B*. So the entire $1.8 million wire transfer was property of K&B, not the Debtor, and could only be deemed property of the Debtor, if at all, because of the assignment of assets by K&B to the Debtor in the Assignment document. So the $471,000.00 part of the $681,000.00 consideration supposedly given by the Debtor to K&B under the Assignment document was property of K&B to begin with. In other words, the Debtor paid $471,000.00 to K&B under the Assignment document *with K&B's money.* That means, of course, that instead of the Debtor giving K&B consideration of $681,000.00, as the Assignment document says, the Debtor, at most, gave consideration of $210,000.00.

Thus, the recital of the $681,000.00 consideration in the Assignment document makes no sense at all.[70] And this further undermines the notion that the Assignment document could have been drafted by an attorney. As such, it further undermines the credibility of both Kattula and Simovski, regarding all of their testimony about the alleged October 1, 2004 Assignment document.

• The testimony of Simovski during the evidentiary hearing, that she signed the

---

[70] In addition, the accountant who represented Kattula and his entities in the Internal Revenue Service audit that concluded in 2008, Robert Gigliotti, testified that the Internal Revenue Service attempted to find documentation for this alleged $681,000 payment by the Debtor to K&B, and was unable to do so. (Gigliotti (Tr. at Docket # 586) at 26, 30 ("nobody could find it"); Gigliotti (Tr. at Docket # 558) at 68).

Assignment document as a witness on October 1, 2004, was impeached by her inconsistent

deposition testimony. During the evidentiary hearing, Simovski admitted that she was not yet

working for Kattula or the Debtor as of October 1, 2004, but she testified that on that day, she

was interviewing for a job with Kattula, when he asked her to witness the signing of the

Assignment document. She also testified that she knew that the Assignment document was

drafted by the in-house counsel Ostrowski because he also was present when she witnessed

Kattula's signature of the document, on October 1, 2004.[71] But in her deposition taken before the

evidentiary hearing, Simovski testified that she first met Robert Kattula *"in late October of 2004,*

*early November," and that she "was introduced to Robert Kattula in late 2004."* In the

evidentiary hearing, she said that her deposition testimony must be mistaken, because she did

meet with Kattula on October 1, 2004, and witnessed his signature that day.[72] No other credible

evidence corroborates Simovski's testimony that she met with Kattula as early as October 1,

2004. Other evidence does prove, however, that Simovski was working for Kattula and K&B as

early as October 11, 2004.[73] But Simovski's inconsistent prior deposition testimony further

undermines her credibility, and the Court finds that Simovski did not actually witness the

signature of Kattula on the Assignment document on October 1, 2004.[74]

---

[71]  Simovski (Tr. at Docket # 303) at 95-96.

[72]  Simovski (Tr. at Docket # 317) at 39-42) (emphasis added).

[73]  See PX-W (e-mail exchanges dated from Monday, October 11, 2004 to Thursday, October 14, 2004, between Simovski and outside accountants then working for K&B); Testimony of Robert Gigliotti ("Gigliotti") (Tr. at Docket # 512) at 92-93.

[74]  The credibility of Kattula was further undermined by, among other things, the testimony of Dan Sills, the managing member and controller of Waste Path Sanitary Landfill, LLC in Kentucky, (Sills (Tr. at Docket # 422) at 55), who had extensive dealings with, and experience working for and with, Kattula, for several years. Sills testified at length in the evidentiary hearing, and he credibly testified that

33

09-72532-tjt    Doc 1125    Filed 04/19/19    Entered 04/19/19 16:48:01    Page 33 of 105

• After Simovski and Kattula signed the Assignment document, on a date much later than October 1, 2004, they back-dated the Assignment document by stating in it a date of October 1, 2004. This back-dating is proven, in part, by evidence showing that Simovski has back-dated other documents that she signed for Kattula and his businesses. For example, the evidence

---

in his Opinion, Kattula's character for truthfulness is not good. (Such testimony came in without objection, and was admissible under Fed. R. Evid. 608(a)). Sills testified as follows:

> Q  Mr. Sills, in -- in your opinion is Mr. Kattula an -- an honest and truthful person?
>
> A  Let me answer it this way. In that I think that with my dealings with Mr. Kattula over the years that he has always answered the -- the questions in the way that it best suited him at the time when he answered it and sometimes they were not always factual answers.
>
> Q  Would that be a no?
>
> A  That would be that I believe that he is not always an honest individual.

(Sills (Tr. at Docket # 491) at 56). By contrast, on cross-examination, the Debtor's counsel elicited the following testimony by Sills, about the character for truthfulness of Prime's Aaron Jade:

> Q . . . Now if I were to tell you that Mr. Kattula thinks that Mr. Jade lies all the time, do you have any opinion about Mr. Jade telling the truth?
>
> A  All of my business dealings with Mr. Jade have been on a very honest level.
>
> Q . . . But do you have any opinion if Mr. Jade ever lies?
>
> A  Not in any dealings with me he has never lied.
>
> Q  Has he ever lied in any dealings with Mr. Kattula?
>
> A  Not that I'm aware of.
>
> Q  Or any of Mr. Kattula's companies?
>
> A  Not that I'm aware of.

*Id.* at 57-58.

includes a document on K&B letterhead dated February 18, 2004, by which Kattula's wife, Maria Kattula, stated that "Effective today, February 18, 2004," she was resigning as managing member of K&B.[75] Simovski signed that document under Maria Kattula's signature, as a witness.[76] But Simovski could not possibly have witnessed Maria Kattula's signing the document on February 18, 2004, because that was more than six months before Simovski ever met Kattula and started working for him in October 2004. On cross-examination, Simovski could not explain this.[77]

• The Debtor's and K&B's in-house attorney Ostrowski, who supposedly drafted the October 1, 2004 Assignment document, filed a lawsuit on behalf of K&B against the City of Cleveland in Ohio *in January 2005.* That suit was brought by "K&B Capital as assignee of TAJ Graphics Enterprises and Purtech vs. City of Cleveland," and it alleged that the Debtor (TAJ) had assigned all of its claims against the City of Cleveland to K&B. Simovski testified that she did not know why this was done, but admitted that this "sounds" "exactly the opposite of what [the] 10-1-04 assignment says."[78] This evidence tends to show that the Assignment document was not actually signed until at least sometime after January 2005, rather than on October 1, 2004.

• As Prime points out, K&B was involved in numerous lawsuits after the purported October 1, 2004 assignment of its assets to the Debtor, and in those lawsuits K&B never mentioned the assignment, until at least 2007. Simovski testified that she does not know why

---

[75] PX-84, Tab 33, first page.

[76] Simovski (Tr. at Docket # 617) at 100; Jade (Tr. at Docket # 709) at 63-64.

[77] *Id.* at 100-01 ("I don't know. . . . No, I don't know . . . I don't know. I don't know. . . . I don't know why it says . . . February of 2004").

[78] Simovski (Tr. at Docket # 317) at 52-53.

this is.[79]

• Simovski and Kattula stated in an e-mail on October 5, 2006 that the purported assignment of assets from K&B to the Debtor occurred *in 2005.* Simovski sent this e-mail on behalf of Kattula on October 5, 2006, to Dan Sills and Glen O'Connell of Waste Path Sanitary Landfill, LLC ("Waste Path"), with copies to Kattula and to Prime's Jade, among others. In that e-mail, Simovski complained about Form 1099s for 2005 that K&B had received from Waste Path. She took the position that the 1099 forms should have been issued to the Debtor rather than to K&B. Her e-mail stated that "*[s]ince 2005*, K&B with its right, assigned all their notes, security agreements, cross-collateralization, UCC to TAJ Graphics Enterprises."[80] This is evidence that no assignment of K&B's assets to the Debtor occurred until at least 2005.

• In an e-mail dated February 25, 2005, which Kattula's attorney Ostrowski sent "at the direction of Bob Kattula," to Dan Sills, Joy Hubb, and Glen O'Connell of Waste Path, Ostrowski stated that K&B "has assigned its financial interest to the Robert T. Kattula Irrevocable Trust on or about 10/2/95. This assignment is subject to the security interests of Prime Financial, and other lending institutions."[81] In this e-mail, Ostrowski tells of an assignment of K&B's assets to a revocable trust that occurred in 1995, but he says nothing about any assignment of K&B assets

---

[79] Simovski (Tr. at Docket # 317) at 49.

[80] PX-54 (emphasis added); Simovski (Tr. at Docket # 343) at 93-94, 98, 99-100. Dan Sills testified that before October 2006, neither Kattula nor anyone on his behalf had told him that K&B had assigned any of its assets to the Debtor. (*See* Testimony of Dan Sills ("Sills") (Tr. at Docket # 439) at 28, 36). Nor did Kattula, Simovski, or anyone else on behalf of Kattula tell Glen O'Connell or Joy Hubb (now known as Joy O'Connell) of Waste Path that K&B had transferred its assets to the Debtor. (*See* Testimony of Glen O'Connell ("O'Connell") (Tr. at Docket # 512) at 25-27, 32-34, 39, 50-51).

[81] PX-94; *see also* Schneiderman (Tr. at Docket # 377) at 68-70; Sills (Tr. at Docket # 491) at 83-85; Jade (Tr. at Docket # 740) at 47.

36

to the Debtor having occurred much more recently, on October 1, 2004 or any other date. This e-mail, written by the same attorney who Kattula and Simovski say drafted the October 1, 2004 Assignment document, is evidence that the Assignment document was not signed before February 25, 2005, and that as of that date, no assets of K&B had been assigned to the Debtor.

• Peter Schneiderman is the attorney for Prime who drafted the loan documents for all of the many loans between Prime, on the one hand, and K&B, Kattula and his various entities on the other hand. Schneiderman credibly testified that he was never told by Kattula or anyone else about any alleged assignment of assets by K&B to the Debtor, and he never saw the alleged October 1, 2004 Assignment document, until the present litigation began in this bankruptcy case — *i.e.*, well after the Debtor filed this bankruptcy case in 2009.[82] This tends to show that K&B did not execute the Assignment document on October 1, 2004, or any time soon after that date. The loan documents Schneiderman drafted included those for the loans known as the Waste Path II loan and the Waste Path III loan, which were loans Prime made to K&B, but not the Debtor, shortly after October 1, 2004. The Waste Path II loan, under which K&B, Kattula, and certain other Kattula-related entities borrowed $650,000.00 from Prime, was made on October 21, 2004, only 20 days after K&B allegedly assigned all of its personal property to the Debtor.[83] The Waste Path III loan, under which K&B, Kattula, and certain Kattula-related entities borrowed approximately $480,000 from Prime, was made just a few months after that, on April 12, 2005.[84] At these times, when K&B was borrowing such substantial new amounts from Prime, one would

---

[82] Schneiderman (Tr. at Docket # 377) at 8-9.

[83] *See* PX-77 (Promissory Note); Schneiderman (Tr. at Docket # 367) at 61-62.

[84] *See* PX-78 (Promissory Note); Schneiderman (Tr. at Docket # 367) at 61-62.

37

certainly expect Kattula to have informed Schneiderman (and Prime's Jade) that K&B had assigned away substantially all of its assets on October 1, 2004, if such an assignment really had occurred. Yet no one told Schneiderman (or anyone from Prime)[85] about the alleged October 1, 2004 assignment of K&B's assets. This shows that no such assignment had actually occurred.

• Similarly, one would expect Kattula to have informed Schneiderman (and Jade) of the alleged October 1, 2004 assignment when Prime, Kattula, K&B, and related entities entered into the so-called "MOU transaction," in November 2005. (This transaction is discussed in detail in Part III.E.3 of this Opinion, below.) But no one told Schneiderman about the alleged assignment at that time either.[86] And Jade credibly testified that he never heard of the alleged October 1, 2004 assignment until late 2007 or 2008.[87]

• There is no evidence that corroborates the testimony of Kattula and Simovski that the Assignment document was signed on October 1, 2004, rather than later. The closest the evidence comes to corroborating their story is the testimony of Robert Gigliotti, who is an accountant hired by Kattula in October of 2004 to prepare financial statements and tax returns for the Debtor and K&B, and Kattula.[88] Gigliotti initially testified, from reviewing his work papers that were admitted into evidence, that he received a copy of the signed Assignment document from

---

[85]  Jade (Tr. at Docket # 709) at 71.

[86]  Schneiderman (Tr. at Docket # 377) at 23-24.

[87]  Jade (Tr. at Docket # 675) at 95-96; Jade (Tr. at Docket # 695) at 25, 28, 51; Jade (Tr. at Docket # 784) at 93-94.

[88]  Gigliotti (Tr. at Docket # 512) at 65, 71-72, 89. After initially estimating that he was hired by Kattula and his entities in August or September 2004, Gigliotti then testified that he and his firm were not engaged until October 2004. (Gigliotti (Tr. at Docket # 558) at 24).

38

Simovski sometime **in early or mid-2005.**[89]  But later in his testimony, Gigliotti was shown, from his work papers, a copy of a fax from Simovski to Gigliotti's partner Roger Zulauf sent on July 15, 2005, by which Simovski sent Zulauf a copy of the signed Assignment document.[90] Gigliotti was then asked if July 15, 2005 was the first time he saw this Assignment document, and he testified that he could not recall if that is so, or whether he saw the document before that time.[91]

Gigliotti testified that one of the tasks he was asked to perform was accounting and bookkeeping work to reflect the assignment of assets from K&B to the Debtor.  But Gigliotti testified that he did not do this work until May or June 2005.[92]  And it is apparent from Gigliotti's work papers and testimony that not all of K&B's personal property was transferred to the Debtor on the books of the Debtor and K&B.[93]  This is further apparent from K&B's 2004 initially filed tax return, which shows K&B with "other current assets" consisting of "notes and loans receivable" of $3,168,655, and total assets of $4,242,305, as of December 31, 2004.[94]  All of this belies the Debtor's assertion that the alleged Assignment document transferred all of

---

[89]  *Id.* at 80-81, 90-92 (discussing PX-Z, a copy of the signed Assignment document, PX-A).

[90]  PX-139, second and third pages.

[91]  Gigliotti (Tr. at Docket # 558) at 45.

[92]  *Id.* at 99-100.

[93]  *E.g.*, Gigliotti (Tr. at Docket # 558) at 54, 55 (discussing his work papers, PX-139, and how they show that a $2.9 million note receivable from Waste Path Sanitary Landfill was kept on the books as an asset of K&B, and not transferred to the Debtor, and that substantial income was kept on the books as income of K&B rather than the Debtor); Gigliotti (Tr. at Docket # 586) at 48-50.

[94]  PX-141 (third page of exhibit which is the first page of Form 1065, at Box F; and Schedule L at line 6(d) ("Other current assets") and line 14(d) ("Total assets"); and "Statement # 2 attached, regarding Schedule L line 6)); Gigliotti (Tr. at Docket # 558) at 73-74.

39

K&B's assets to the Debtor on October 1, 2004.[95]

Gigliotti prepared the 2004 federal income tax return for the Debtor in August 2005; that tax return was completed by Gigliotti on August 17, 2005, and filed with the Internal Revenue Service within a week or two thereafter.[96]  According to Gigliotti, this tax return reflects the assignment of assets (and liabilities) from K&B to the Debtor as having occurred by December 31, 2004.[97]

But it is clear that in doing the work he did for the Debtor in 2005, Gigliotti was woefully uninformed about the Debtor and its history.  The 2004 tax return that Gigliotti prepared for the Debtor erroneously stated that it was the Debtor's initial tax return, that the Debtor had started its business on January 1, 2004, and that at the beginning of 2004, the Debtor had no assets, no liabilities, and no capital.[98]  All of these statements were false.[99]  Gigliotti testified that he was not aware of any of the following: (a) that the Debtor in fact was ***not*** a new entity formed in 2004; (b) that the Debtor had been in a Chapter 11 bankruptcy starting in 2003; and (c) that the Debtor had emerged from that bankruptcy in 2004.  Rather, Gigliotti's understanding was that the Debtor was a new company that "was formed in 2004," with "no prior tax returns and no [prior]

---

[95]  *See* Gigliotti (Tr. at Docket # 558) at 74.

[96]  DX-Y; Gigliotti (Tr. at Docket # 512) at 95-97.

[97]  *Id.* at 98-100 (discussing the 2004 tax return, DX-Y, at p. 1, Box F, and at the sixth page of DX-Y, Schedule L).

[98]  *See* DX-Y, first page, statement at top: "Initial Return," and Box E, stating "01/01/2004" as "Date business started;" sixth page, Schedule L.

[99]  The Court notes that the Employer Identification Number (the "EIN") on this 2004 tax return is identical to the EIN on the Debtor's bankruptcy petition in this case.  (Compare DX-Y, first page at Box D with the bankruptcy petition in this case (Docket # 1) at p. 1).

40

history."[100]  Gigliotti testified that he was told this by either Kattula or Simovski.[101]

In any event, the *most* that can be gleaned from this evidence, *at best* from the Debtor's perspective, is that: (a) the alleged October 1, 2004 Assignment document had been signed by sometime in early to mid-2005; (b) the Debtor's books and records were first modified to reflect an assignment of assets from K&B to the Debtor in May or June 2005; and (c) the Debtor's 2004 federal income tax return, though filled with errors, reflected a transfer of K&B assets to the Debtor as having been done by December 31, 2004.  None of this corroborates the testimony of Kattula and Simovski that the Assignment document actually was signed, and that K&B assets were assigned to the Debtor, on October 1, 2004.

From all of the evidence, the Court finds that the Assignment document was actually signed by Kattula and witnessed by Simovski considerably later than October 1, 2004, and probably not until sometime in late February 2005 or later.  So when the $1.8 million wire transfer payment was made to Prime ***on October 1, 2004***, it was not a payment made by or on behalf of the Debtor.  Rather, it was a payment made by and on behalf of K&B, only.

**Second**, even if the Assignment document actually had been signed by Kattula and Simovski on October 1, 2004, that document would not have validly assigned anything from K&B to the Debtor.  This is so for the following reasons.

On October 1, 2004, the Debtor had no legal authority to enter into the transaction described by the Assignment document.  The October 1, 2004 date of the alleged assignment of K&B assets to the Debtor was only two days after the Court entered the September 29, 2004

---

[100]  Gigliotti (Tr. at Docket # 512) at 97, 98; Gigliotti (Tr. at Docket # 558) at 40.

[101]  *See* Gigliotti (Tr. at Docket # 558) at 41.

Order confirming the Debtor's 2004 Plan, in the 2003 Case. But as of October 1, 2004, the

Debtor's confirmed 2004 Plan was not yet effective — rather, the "Effective Date" of that 2004

Plan was not until October 12, 2004. (*See* Part III.B of this Opinion, above). So there is a

serious problem with the alleged Assignment document, dated October 1, 2004, if it actually was

signed on October 1, 2004, as both Kattula and Simovski have testified. The problem is that on

October 1, 2004, the Debtor had *no legal authority* to enter into the assignment transaction with

K&B, under either the Bankruptcy Code or the confirmed 2004 Plan.

The transaction set out in the October 1, 2004 Assignment document, as described above,

was the payment by the Debtor of $681,000.00 to K&B, in exchange for the assignment by K&B

to the Debtor of all or substantially all of K&B's assets. Such a transaction clearly was outside

the ordinary course of business for the Debtor. As such, the Debtor could not engage in such a

transaction, while still in bankruptcy as it was, without "notice and a hearing," under 11 U.S.C.

§ 363(b)(1). That section of the Bankruptcy Code states, in pertinent part, and with exceptions

not applicable here, that "the trustee [which includes a Chapter 11 debtor in possession, under 11

U.S.C. § 1107(a)], after notice and a hearing, may use, sell, or lease, other than in the ordinary

course of business, property of the estate." Under § 363(b)(1), an entity that is a Chapter 11

debtor in possession may not use, sell, or lease any of its property (all of which is property of the

bankruptcy estate), other than in the ordinary course of business, without notice and a hearing, or

an order of the bankruptcy court.[102] "'[W]here the transaction is outside the ordinary course of

---

[102] Section 363(b)(1) contrasts with § 363(c)(1), which states the general rule that "unless the court orders otherwise," a trustee (or Chapter 11 debtor in possession) may "enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing. . .." 11 U.S.C. § 363(c)(1).

the debtor's business, the debtor may not 'use, sell, or lease' estate property until creditors and other interested parties are given notice of the proposed transaction and the opportunity for a hearing if they object.'" *Austin v. BFW Liquidation, LLC* (*In re BFW Liquidation, LLC*), 471 B.R. 652, 671 (Bankr. N.D. Ala. 2012) (citation omitted).

The Federal Rules of Bankruptcy Procedure and this Court's Local Rules require that a 21-day notice of such a non-ordinary course use, sale, or lease of bankruptcy estate property be served by the debtor in possession on all creditors, and any party in interest may file an objection within 14 days after service of the notice. *See* Fed. R. Bankr. P. 6004(a), 6004(b), 2002(a)(2), 2002(c)(1); E.D. Mich. LBR 6004-1(a).[103]

As of October 1, 2004, nothing in the just-confirmed plan in Debtor's 2003 Case authorized the Debtor to do anything yet, because that 2004 Plan was not yet effective. And in any event, there is nothing in that confirmed 2004 Plan that authorized, contemplated, or even hinted at any transaction anything like the one described in the alleged October 1, 2004 Assignment document between the Debtor and K&B. (*See* Part III.B of this Opinion for a

---

[103] The rules cited are the current versions of the applicable rules. In relevant part, they are the same as the applicable rules that were in effect on October 1, 2004, except that the 21-day notice in current Rule 2002(a)(2) was 20 days in 2004, and the 14-day objection deadline in LBR 6004-1 was 15 days in 2004. *See* Fed. R. Bankr. P. 2002(a)(2) (eff. Dec. 1, 2003); E.D. Mich. LBR 6004-1 (eff. Oct. 1, 1998). As of October 1, 2004, LBR 6004-1(a) stated:

> (a) Except for the use of cash collateral, use, sale or lease of property of the estate shall be effected in accordance with Code § 363 and F.R.Bankr.P. 2002 and 6004. The notice of use, sale or lease shall be served by the trustee or debtor-in-possession as the case may be. The notice shall include a statement that the time fixed for filing an objection is 15 days from the date the notice is served. Neither a court proceeding nor an order is necessary or contemplated to authorize the transactions set forth in the notice unless there is a timely-filed objection which is not formally withdrawn. The 15-days period in this paragraph begins to run contemporaneously with the 20-days notice in F.R.Bankr.P. 2002(a)(2).

description of the 2004 Plan).

For these reasons, as of October 1, 2004, the Debtor was required by Bankruptcy Code § 363(b)(1) to give notice to all creditors, including Prime, of the transaction described in the alleged October 1, 2004 Assignment document, and if anyone timely objected, a hearing would have to be held and an order obtained authorizing the transaction. Because none of this occurred, the Debtor had no legal authority to enter into such a transaction on October 1, 2004.

This is a further, strong reason why the Court finds that the Debtor in fact did *not* enter into this transaction with K&B on that date, contrary to the sworn testimony of Kattula and Simovski. This is particularly true given the fact that at that time, the Debtor was still represented in the 2003 Case by highly competent and experienced Chapter 11 counsel (Michael Baum and the firm of Schafer and Weiner). Such counsel certainly would have advised Kattula and the Debtor that such a transaction with K&B on October 1, 2004 would be both (1) contrary to bankruptcy law; and (2) inconsistent with the Chapter 11 2004 Plan that had just been confirmed two days earlier.

But in any event the legal result, *if* the Debtor did in fact enter into that transaction on that date, as Kattula and Simovski have sworn the Debtor did, is that the transaction is not effective, at least as against Prime. This is so because Prime had no notice of the alleged Assignment transaction until long after October 1, 2004. *See generally Austin v. BFW Liquidation,* 471 B.R. at 670-71. For example, in discussing the effect of a bankruptcy debtor selling assets outside the ordinary course of business without providing the required notice, the court in *BFW Liquidation* cited many cases for the following propositions:

> Failure to provide the notice required by . . .[R]ule 2002(a)(2) is grounds for setting aside a bankruptcy sale in appropriate

44

circumstances. "[A] sale without a required Rule [2002(a)(2)] notice may be set aside." "The most common remedy, where adequate notice of sale has not been given, is to set the sale aside or to treat it as voidable, typically at the option of the person who failed to receive notice." "Ample authority exists for the principle that sales within the scope of § 363(b)(1), of which no proper notice was provided, may be set aside." . . . "[Debtor-in-possession's] failure to comply with 11 U.S.C. § 363(b) forms an independent basis for voiding the entire Agreement [. . .]." . . . Some even say that a sale without the requisite notice is void.

*Id.* (citations omitted); *see also* 3 *Collier on Bankruptcy* ¶ 363.02[1][b], at 363-14 (Richard Levin & Henry J. Sommer, eds., 16th ed. 2018) (footnote omitted) ("And, depending on the circumstances, a court may invalidate a sale entirely or find the order approving the sale to be ineffective to sell property free and clear of the applicable creditor's interests if the trustee fails to give direct notice to an adverse claimant of whom the trustee had notice.")

**Third**, the Court finds that, regardless of whether the Assignment document was actually signed on October 1, 2004 or on a later date, this document did not actually assign ***anything*** from K&B to the Debtor. This is so for the following reasons.

• As noted above, the second paragraph of the Assignment document contains a sentence that is not a complete sentence, but which refers to the assignment as being "As set forth that certain Purchase, Sale or Operating Agreements." And as noted above, during the long evidentiary hearing, the Debtor never produced or offered into evidence any "Purchase, Sale or Operating Agreements" that mention or have anything to do with this alleged assignment of assets by K&B to the Debtor. Nor did the Debtor ever assert that there were any such agreements. From this, the Court finds that there are no such "Purchase, Sale or Operating Agreements" that "set forth" the assignment of any assets from K&B to the Debtor. From this, in turn, the Court finds that under the wording of the Assignment document itself, that document

45

actually assigned *nothing* from K&B to the Debtor. This flaw in the document is most likely due to the fact that, as the Court has found, no attorney had any role in drafting the document.

• Although the Assignment document purports to be an assignment from K&B to the Debtor, neither K&B nor the Debtor actually signed the document. The only signatory was Kattula, and the Court finds that he signed the document individually, rather than on behalf of either K&B or the Debtor. Nothing in the Assignment document, or at Kattula's signature line, indicated that Kattula was signing the document on behalf of either K&B or the Debtor. So the Assignment document was not effective to assign anything from K&B, which was a limited liability corporation (LLC), separate from Kattula individually. This flaw in the document also is likely due to the fact that no attorney had any role in drafting the document.

**Fourth**, even if the Assignment document actually had been signed on October 1, 2004, and even if it actually was effective to assign anything from K&B to the Debtor on that date, the Court could not find that any part of the $1.8 million wire transfer made to Prime on October 1, 2004 was a payment of the Debtor's money, rather than a payment of K&B's money. Rather, the payment still would have to be deemed a payment of K&B's money. So it cannot be deemed to be a payment by or on behalf of the Debtor in any event.

This is so because of the third paragraph of the Assignment document. That third paragraph immediately follows the paragraph in which K&B purports to assign to the Debtor K&B's "chooses in actions, lawsuits, collections, judgments and any and all claims (hereinafter 'claims')." The third paragraph clearly shows that this assignment was done solely for collection purposes. That is, the assignment merely permitted the Debtor to enforce and collect, *on behalf of K&B*, K&B's claims. The assignment did not transfer ownership of the claims to the Debtor.

46

So the claims remained the property of K&B. As quoted above, the third paragraph states:

> WHEREAS, it is the intent of this Assignment is to transfer to Assignee full power to legally pursue certain known and unknown claims, Assignor does hereby appoint Assignee his attorney in fact, with full authority to enforce the herein assigned, and to collect and receive the judgments, as Assignor would do if this Assignment were not being made. Any costs incurred by the Assignee in enforcing the claims, shall be borne by the Assignee TAJ Graphic Enterprises, LLC.[104]

If the intent of the Assignment document was to assign *ownership* of K&B's claims to the Debtor, there would be no need in this document for K&B to give this power of attorney to the Debtor — *i.e.*, to appoint the Debtor as K&B's "attorney in fact." Such appointment, and the other language of the third paragraph, are inconsistent with a transfer of ownership of the claims, and show that no such ownership transfer was intended.

So the purported assignment in the Assignment document did not transfer ownership of any of K&B's assets to the Debtor. For this additional reason, the October 1, 2004 wire transfer of $1.8 million to Prime must be deemed to be a payment by K&B to Prime, and not a payment by or on behalf of the Debtor to Prime.

**Fifth**, there is an additional reason why, even if the purported October 1, 2004 assignment of assets from K&B to the Debtor did occur on October 1, 2004, it does not matter. Even in that event, the $1.8 million wire transfer from GEM to Prime could not be deemed a payment by the Debtor to Prime. This is so because the $1.8 million payment was GEM's payoff of the balance it owed on the $1.95 million July 2003 promissory note, *and the original payee on that promissory note, K&B, had previously assigned that note to Prime, on August 21,*

---

[104] DX-A.

***2003.***[105]

That assignment was done by a document that was admitted into evidence as CX-68. That document is entitled "Assignment of Promissory Note," and was signed by K&B, by Robert Kattula as its "[a]uthorized [a]gent." (In cross-examination, Kattula admitted that he signed this assignment document.) Attached to this assignment document is the July 2003 promissory note in the amount of $1.95 million from GEM to K&B, described above. That note was originally payable by GEM to K&B. The assignment document, dated August 21, 2003, assigned that note to Prime, and said that "THIS NOTE SHALL BE PAYABLE TO THE ORDER OF: PRIME FINANCIAL, INC."

This assignment document assigned all of K&B's rights under the GEM promissory note to Prime, and made Prime the payee under the note, more than a year before K&B purportedly transferred its assets to the Debtor under the October 1, 2004 Assignment document. It is clear from the evidence that this assignment was done in order to secure payment of K&B's debt to Prime under the K&B Cleveland loan.[106] But even so, any assignment on October 1, 2004 of K&B's assets to the Debtor would have been subject to Prime's prior interest as the holder and payee of the GEM note. The purported October 1, 2004 assignment of K&B's assets, therefore, did not transfer to the Debtor any right to payment under the GEM promissory note, because K&B had no such right at that time. And the GEM promissory note, and debt owing by GEM that the note evidenced, remained collateral that K&B had given to Prime to secure the K&B

---

[105] This date was four months before the Debtor filed its 2003 bankruptcy case, on December 23, 2003.

[106] *See* PX-13 at second page (page 2 of August 21, 2003 promissory note), and at seventh page (page 1 of security agreement); Kattula (Tr. at Docket # 291) at 105-06; Jade (Tr. at Docket # 675) at 92 *see also* PX-73 (August 21, 2003 "Assignment of Rent and Leases").

Cleveland loan.  It follows from these facts that when GEM paid off the promissory note on October 1, 2004, by making the $1.8 million wire transfer to Prime, none of that payment was or can be viewed as a payment ***by or on behalf of the Debtor*** to Prime.

As noted above, Kattula admitted that he signed the August 21, 2003 assignment document.[107]  But he testified that the $1.95 million promissory note attached to this document was not the "correct" promissory note.[108]  During the very long evidentiary hearing, however, Kattula and the Debtor never produced or offered into evidence the version of the GEM $1.95 million promissory note that Kattula says was the "correct" one.  The Court finds that the promissory note attached to PX-68 is indeed the "correct" — and one and only — promissory note from GEM to K&B,[109] which was paid off by GEM's $1.8 million wire transfer to Prime on October 1, 2004.

**Sixth**, other substantial evidence contradicts Kattula's and the Debtor's theory about the purported October 1, 2004 Assignment document.  Their theory, and Kattula's testimony, is that this document assigned all of the assets of K&B to the Debtor, and it did so on October 1, 2004, the day on which Kattula and Simovski say it was signed.  The document did not purport to assign or transfer any real estate, however, so it clearly did not assign the Luna Pier real estate, which K&B owned as of October 1, 2004.[110]  But with respect to K&B's personal property, the

---

[107]  Kattula (Tr. at Docket # 354) at 50.

[108]  *Id.* at 52.

[109]  *See, e.g.*, Levy (Tr. at Docket # 414) at 42.

[110]  Without informing Prime, Kattula later caused K&B to transfer the Luna Pier real estate to a Kattula-owned entity named Luna Pier Truck Depot, LLC, sometime before November 16, 2005.  After Prime learned of this transfer from a title search, Kattula caused Luna Pier Truck Depot, LLC to agree to join K&B as a party liable on the Luna Pier loan.  (*See* Schneiderman (Transcript at Docket # 377) at 55-

49

federal income tax returns that Kattula originally caused K&B to file for the years 2005 through 2008 show that Kattula, the Debtor, and K&B *did not, at that time,* consider K&B to have assigned all of its personal property to the Debtor.

Initially during the evidentiary hearing, in an attempt to support the Debtor's claim that the October 1, 2004 Assignment document was signed on October 1, 2004 and that K&B's assets were assigned to the Debtor on that date, the Debtor pointed to the ***amended*** federal income tax returns that K&B filed for the years 2005, 2006, and 2007,[111] all of which show K&B as having no assets, no income, and no expenses — in sum, no economic activity at all — during those years. But according to Simovski, these amended tax returns were filed ***in November 2008***, and were filed as a result of an Internal Revenue Service audit.[112] But, Simovski says, these amended tax returns show no activity by K&B during these years because of the October 1, 2004 assignment of K&B's assets to the Debtor.[113]

But as Prime pointed out, (1) the amended returns were not filed until November 2008, more than four years after the purported October 1, 2004 assignment of K&B's assets to the Debtor; and (2) as Simovski admitted, the initial tax returns that previously were filed by K&B

---

57; PX-84, Tab 21 (November 16, 2005 agreement entitled "Second Modification of Loan Documents"); *see also* Simovski (Tr. at Docket # 617) at 76-78).

      Kattula later caused the transfer of the Luna Pier real estate, again without informing Prime, to another Kattula-owned entity named DA Enterprises. Prime learned of this transfer from a title search. (*See* Levy (Tr. at Docket # 414) at 74-75; *see also* Simovski (Tr. at Docket # 617) at 77-78).

[111] DX-H, I, J.

[112] Simovski (Tr. at Docket # 303) at 8-9, 24.

[113] *Id.* at 13, 32-33, 34.

for the years 2005-2007 did show economic activity for K&B.[114]  Prime also points to the fact

that during 2005 there were funds coming into K&B's bank accounts, and K&B was issuing

checks from those accounts.[115]  And the outside accountant for the Debtor and K&B, Gigliotti,

who represented Kattula and his entities in the IRS audit that concluded in 2008, testified that the

K&B tax returns were amended in 2008 because the IRS determined that K&B was an alter ego

for Kattula, for tax purposes, so that all of the K&B economic activity for those years should be

reflected on Kattula's personal income tax return, rather than on tax returns for K&B.[116]  So,

contrary to Simovski's testimony, the 2005-2007 tax returns for K&B were not amended because

K&B had no economic activity for those years, due to the purported October 1, 2004 assignment.

**b.  The Debtor's allegation that in any event, the Debtor owned $900,000 of the $1.8 million that was wire transferred by GEM to Prime on October 1, 2004**

In addition to its theory that K&B assigned its assets to the Debtor on October 1, 2004,

the Debtor claims that even without the October 1, 2004 assignment, at least $900,000.00 of the

money wired to Prime on October 1, 2004 must be deemed to be property owned by the Debtor,

and therefore must be deemed to be a payment by the Debtor on Prime's $1.2 million claim

under the 2004 Plan.  This is because, according to Kattula's testimony, GEM had leased part of

the Debtor's real property in Cleveland, beginning on July 9, 2001, for $25,000.00 per month.

GEM had not paid any of the required monthly lease payments, and at the time of the July 2003

settlement, owed the Debtor at least $900,000.00 in lease payments ($25,000.00 per month x 36

---

[114]  Simovski (Tr. at Docket # 317) at 21-24.

[115]  *See id.* at 24; Simovski (Tr. at Docket # 303) at 105-07; *see also, e.g.,* Sills (Tr. at Docket # 439) at 61-65 (discussing PX-104 and the flow of money into and out of K&B's bank account); O'Connell (Tr. at Docket # 512) at 29 (same).

[116]  Gigliotti (Tr. at Docket # 558) at 68, 69-70.

months = $900,000.00).  Payment of this $900,000.00, according to Kattula, was part of the

$1.95 million promissory note that GEM made payable to K&B, as part of the July 2003

settlement.  This is so, Kattula says, even though the GEM note was payable only to K&B, not

the Debtor, while the $900,000.00 in rent allegedly was owed to the Debtor, which owned the

real estate and leased the property to GEM.[117]  Thus, according to Kattula, GEM's October 1,

2004 payoff of the balance then owing on the $1.95 million promissory note, by wiring the $1.8

million payment to Prime at Kattula's direction, should be viewed as including a payment of

$900,000.00 of the Debtor's money to Prime.

Prime disputes this theory.  And the Court rejects this theory, because it is not proven.

The Court finds that Kattula's testimony in support of this theory is not credible, and there is no

other supporting evidence.  Rather, this theory is contradicted by all of the persuasive evidence

— *i.e.*, all of the evidence other than the testimony of Kattula and Simovski.

The Debtor did not present any written evidence of any lease between GEM and the

Debtor, under which GEM was to lease any Cleveland property for $25,000.00 per month, either

for the period alleged (2001 to 2003), or for any other time period.  Kattula testified that he had a

copy of that lease in his office,[118] but he never produced it at any time during the long evidentiary

hearing.  And the Debtor stated in its initial and supplemental disclosure statements, filed in June

2004 and September 2004 in the 2003 case, that since July 2003, GEM was paying rent of only

---

[117]  Kattula (Tr. at Docket # 267) at 14-15, 24; Kattula (Tr. at Docket # 275) at 34-35; Kattula
(Tr. at Docket # 295) at 81-82, 83-86 (the $900,000.00 in rent owing by GEM to the Debtor was "rolled
into" the $1.95 million GEM promissory note).

[118]  *E.g.*, Kattula (Tr. at Docket # 283) at 41.  Similarly, Simovski testified that the Debtor "had a
lease agreement with GEM for $900,000," and that she had seen that lease agreement.  (Simovski (Tr. at
Docket # 317) at 96-97, 101).  But the Debtor never produced such a written lease agreement during the
lengthy evidentiary hearing.

$4,000.00 per month.[119]

In addition, the July 30, 2003 settlement agreement (PX-3), under which GEM obligated itself to make the $1.9 million promissory note payable to K&B, and which was the basis for GEM's October 1, 2004, $1.8 million wire transfer to Prime, does not mention or support the Debtor's claim that it included anything for any lease claims the Debtor had against GEM. There is no indication whatsoever in this settlement agreement that any part of GEM's $1.9 million note, payable to K&B, included payment of any lease claim owing to the Debtor, in any amount, let alone an amount as large as $900,000.

Finally, other substantial evidence refutes the Debtor's claim about the $900,000 rent claim:

• The Debtor's plan and disclosure statement filed in the 2003 case, including the liquidation analysis attached to that document, did not mention such a claim against GEM.[120]

• The Debtor's schedules filed in the 2003 bankruptcy case did not expressly list any such claim for past-due rent owing by GEM. Nor did they indicate that the Debtor owned any share of the payments due from GEM under the $1.9 million promissory note payable to K&B. The only hint in the Debtor's schedules in the 2003 case that any debt was owing to the Debtor by GEM was in the Debtor's Schedule B, filed in the 2003 case on January 21, 2004, which listed as an asset "GEM potential lawsuit," with a value of "Unknown."[121]

For all of the above reasons, the Court finds and concludes that all of the $1.8 million

---

[119] *See* 2004 Plan at 32, § II.C of the Disclosure Statement; Supplemental Disclosures to Debtor's Disclosure Statement, filed September 15, 2004 (Docket # 94 in the 2003 Case) at ¶ a.

[120] PX-64, Schedule B at item 20.

[121] A copy of that liquidation analysis is CX-71.

wire transfer that occurred on October 1, 2004 must be deemed to be payment by K&B of its debts to Prime, and not any payment by or on behalf of the Debtor of Prime's $1.2 million allowed claim under the 2004 Plan.

## 2. The October 4, 2004 wire transfer of $468,660.09 by the Debtor's bankruptcy counsel to Prime

The second wire transfer by which the Debtor allegedly paid Prime's $1.2 million claim under the 2004 Plan occurred on October 4, 2004. On that day, the Debtor's bankruptcy counsel in the 2003 Case, Schafer and Weiner, PLC, wired $468,660.09 to Prime.[122] This money came from the $500,000.00 in proceeds from the sale of the Debtor's Transport Property in Cleveland, to GEM.[123] This sale to GEM was contemplated by the 2004 Plan, and was consistent with the July 2003 settlement agreement with GEM, discussed above and in the Debtor's 2004 Plan Amendments, filed September 1, 2004, under which GEM had an option to purchase the Transport Property for $500,000.00, if GEM also paid in full the balance owing on the $1.95 million promissory note (which note GEM paid off on October 1, 2004, as discussed above).

According to Kattula, he had promised Prime's President, Jade, that when the Debtor received the $500,000.00 in proceeds from the sale of the Transport Property, the Debtor would pay that to Prime.[124] According to Kattula, the Debtor's bankruptcy counsel, Schafer and Weiner, told Kattula that these sale proceeds had to be sent to Schafer and Weiner. That firm received the $500,000.00 in sale proceeds, took fees of $31,339.91 from this amount, and at

---

[122] Kattula (Tr. at Docket # 267) at 35; DX-C.

[123] Kattula (Tr. at Docket # 267) at 31, 38.; Kattula (Tr. at Docket # 275) at 38; Simovski (Tr. at Docket # 303) at 45. Later, Kattula testified that this property was sold to ESG, a company owned and formed by the owners of GEM to purchase the property. (Kattula (Tr. at Docket # 283) at 110).

[124] Kattula (Tr. at Docket # 267) at 31, 33-34; Kattula (Tr. at Docket # 275) at 67-68.

Kattula's direction, wired the balance of $468,660.09 to Prime.[125] The Debtor contends that since the $500,000.00 was proceeds of the sale of the Debtor's real estate, the resulting wire transfer to Prime was intended as, and must be deemed to be, a payment *by the Debtor* on Prime's $1.2 million claim under the 2004 Plan. And according to Kattula, Prime's President Jade told Kattula that this sum would be applied to the Debtor.[126]

The Debtor's contention that this wire transfer should be viewed as a payment from the Debtor to Prime is further supported by the fact that Debtor's bankruptcy counsel at Schafer and Weiner (specifically, the late Arnold Schafer), instructed that firm's Kimberly Peickert to write "re: TAJ Graphics" in the "Special Instructions" box on the Comerica Bank wire transfer request form, and Peickert did so, after which Mr. Schafer signed it.[127] This, in turn, led to Comerica Bank including on its one-page "Statement of Wire Activity" for this wire transfer, under "Other Transaction Info," the words "TAJ GRAPHICS."[128]

Prime contends, based on the testimony of Jade and his interpretation of the 2004 Plan, that the $468,660.09 wire transfer was not proceeds of a sale of the Debtor's real estate, because the real estate in question belonged to K&B at the time of the sale. K&B owned that property, Jade says, because K&B had purchased the property at an auction held shortly before

---

[125] Kattula (Tr. at Docket # 267) at 36-37; DX-C; Kattula (Tr. at Docket # 275) at 66-67; Kattula (Tr. at Docket # 283) at 7-8.

[126] Kattula (Tr. at Docket # 267) at 38.

[127] Testimony of Kimberly Peickert ("Peickert") (Tr. at Docket # 969) at 28-29, 32; DX-C (last page).

[128] Peickert (Tr. at Docket # 969) at 30-31; DX-C (fifth page).

confirmation of the 2004 Plan.[129]  As a result, Prime says, the wire transfer payment must be deemed to have been made by K&B, not the Debtor.

But Jade and Prime are wrong about this.  Rather, the Court finds that the real estate in question, known as the Transport Property, still belonged to the Debtor when it was sold, not to K&B.  Rather than purchasing this property, as the only bidder at the sale auction described in the 2004 Plan, K&B ultimately elected to have the Debtor sell and transfer the property to a third party (an entity formed by the owners of GEM).[130]  So the property was sold by the Debtor to that third party, and the proceeds of that sale must be deemed to have been property of the Debtor, not of K&B.  Thus, the $468,660.09 wire transfer to Prime on October 4, 2004 was in its entirety a payment *by the Debtor* to Prime.

Prime did not keep the entire amount of the October 4, 2004 wire transfer.  Rather, at Kattula's request, Prime retained only $189,315.28 of the $468,660.09 wire transfer amount, and the next day wired the remaining balance of $279,344.81 to K&B.  At Kattula's request, the $189,315.28 amount that Prime retained from the October 4, 2004 wire transfer was applied as payment on a loan known as the K & C Group Loan, to pay interest then owing and to pay down the principal owing on that loan to $200,000.00.[131]

The K & C Group Loan was a loan of $425,000 made by Prime to K & C Group, LLC in November 2003.  That Kentucky LLC had been formed in July 2003, and its members were

---

[129]  *See* Jade (Tr. at Docket # 740) at 48-51 (discussing PX-2).

[130]  *See* discussion of the sale of this property under the confirmed 2004 Plan, including the provision in the order confirming plan, in Part III.B of this Opinion; *see also* Kattula (Tr. at Docket # 283) at 110; Kattula (Tr. at Docket # 267) at 38; Kattula (Tr. at Docket # 275) at 38; Simovski (Tr. at Docket # 303) at 45.

[131]  Jade (Tr. at Docket # 682) at 63-65; PX-7; PX-129; Rieman (Tr. at Docket # 519) at 43-44.

56

Maria Kattula (Robert Kattula's wife) and Stefanie Crowell. The K & C Group Loan was personally guaranteed by K&B, Robert Kattula, Maria Kattula, Stefanie Crowell, and Jaime Crowell. The K & C Group Loan eventually was paid off, in April 2005.[132]

At this point, the Court notes some further facts about the two wire transfers to Prime that occurred on October 1, 2004 and October 4, 2004, within days after the Debtor's 2004 Plan was confirmed on September 29, 2004, and which the Debtor contends were payments of the Debtor's money and which must be considered payments entirely from the Debtor to Prime. These two wire transfers resulted in Prime receiving and retaining substantially more than the $1.2 million that the 2004 Plan required the Debtor to pay to Prime. The $1,235,491.12 that Prime retained as the payoff of the K&B Cleveland loan from the October 1, 2004 wire transfer, plus the $468,660.09 Prime received in the October 4, 2004 wire transfer, total $1,704.151.21. When one subtracts from this total the $279,344.81 that Prime did not retain from the October 4, 2004 wire transfer (but instead wired to K&B on October 5, 2004), it still leaves a total of $1,424,806.40 that the Debtor says it paid to Prime in the two October 2004 wire transfers. This was $224,806.40 more than the $1.2 million the Debtor was obligated to pay Prime under the 2004 Plan. And when these payments were made, no interest had yet accrued on Prime's $1.2 million claim under the 2004 Plan. This is because under the 2004 Plan, interest did not begin to accrue until the Plan's "Effective Date," which was October 12, 2004. *See* discussion in Part III.B of this Opinion.

When asked why the Debtor had paid so much more to Prime than it was obligated to pay

---

[132] Jade (Tr. at Docket # 682) at 66-69; PX-75 (loan documents for the K & C Group Loan, including promissory note, guaranty agreements signed by the five guarantors including K&B, and K & C Group, LLC operating agreement showing the LLC's formation and members).

57

under the 2004 Plan, Kattula testified that the extra money was for payment on "some delinquencies on some other loans" that Prime alleged were owing on loans that K&B had with Prime.[133] The Court finds this explanation unpersuasive. Rather, the more credible explanation is that the October 1, 2004 wire transfer, which was a net payment to Prime of $1,235,491.12 that paid off the K&B Cleveland loan, was not a payment by the Debtor or of the Debtor's property at all. This further bolsters the Court's conclusion to that effect, which is discussed in Part III.D.1 of this Opinion, above.

For the reasons stated in detail in Part III.D.1 of this Opinion, the Court has found that no part of the October 1, 2004 wire transfer can be deemed a payment by or on behalf of the Debtor to Prime. But the Court agrees with the Debtor that all of the October 4, 2004 wire transfer to Prime, in the amount of $468,660.09, must be deemed a payment by the Debtor to Prime. Because this payment was from proceeds of the $500,000 sale of the Debtor's real estate (the Transport Property) to GEM, the proceeds must be considered to have been the Debtor's property, and the payment must be considered to have been made by the Debtor.

Moreover, the amount that the Debtor must be deemed to have paid to Prime is the full amount of the $468,660.09 wire transfer that Prime received on October 4, 2004. This is so even though Prime did not keep the entire amount of the October 4, 2004 wire transfer. As discussed above, the next day, Prime wired $279,344.81 of this money to K&B, at Kattula's request. This amount was wired to the bank account of K&B,[134] and there is no evidence that the Debtor ever received any of this money from K&B. So there is no evidence that the Debtor ever got back any

---

[133] *See* Kattula (Tr. at Docket # 267) at 39-40.

[134] *See* Kattula (Tr. at Docket # 267) at 91; Jade (Tr. at Docket # 682) at 63-64; PX-7.

portion of the $468,660.09 payment that was made to Prime by the Debtor, from the Debtor's property (the proceeds of the sale of the Debtor's real estate).[135]

So Prime's allowed claim in this case must be reduced by $468,660.09, plus interest. The effect of this is that Prime's $1.2 million allowed claim from the 2003 Case is reduced to $731,339.91, and Prime is only entitled to interest on that amount, not on the full $1.2 million amount. As discussed above, under the confirmed 2004 Plan in the Debtor's 2003 bankruptcy case, interest on Prime's allowed claim begins to run only on the Effective Date of October 12, 2004.

Because of the Debtor's October 4, 2004 partial payment on Prime's allowed claim, interest accrued only on the reduced claim amount of $731,339.91. At 17% per annum, beginning on October 12, 2004 and accruing until the October 21, 2009 petition date of the Debtor's current bankruptcy case, the interest on Prime's reduced claim of $731,339.91 is $624,704.54. Prime's total allowed claim in this case, therefore, is $1,356,044.45. This is

---

[135] Kattula testified that there was a third wire transfer to Prime in early October 2004 of money that belonged to the Debtor. Kattula testified that GEM wired $279,000.00 to Prime, on some unspecified date during the first few days of October 2004, which Kattula says was additional money that GEM owed to the Debtor, for delinquent rent and environmental liabilities under the July 2003 settlement. But according to Kattula, Prime did not keep any of that money. Rather, Kattula says, Prime wired that $279,000 to K&B, because at the time, K&B was current on its loans with Prime. (*See* Kattula (Tr. at Docket # 267) at 42-44, 92.)

The Court does not credit Kattula's testimony that there was a third wire transfer to Prime in early October 2004. There is no evidence of such a third wire transfer, other than Kattula's vague and unsubstantiated testimony. Rather, the evidence and the relevant documents admitted into evidence show only the two wire transfers discussed in this Opinion, which were the ones made on October 1, 2004 and October 4, 2004. Kattula is correct about Prime having wired approximately $279,000 to K&B on October 5, 2004 — as noted above, K&B's bank statement for October 2004 shows that Prime wired $279,344.81 to K&B on October 5, 2004. (*Id.* at 91; PX-7). But that wire transfer by Prime to K&B represented part of the $468,660.09 wire transfer that Prime had received on October 4, 2004, as discussed above.

subject to further reduction, if and to the extent the Debtor has met its burden of showing that any other payments were made on the Debtor's debt to Prime.

**3.   Other evidence presented by the Debtor in support of its allegation that Prime's claim was paid in full in October 2004**

The Debtor offered additional evidence in support of its allegation that the October 2004 wire transfers to Prime paid the Debtor's claim in full.

Kattula testified that Prime's President Jade specifically told Kattula "that the plan obligation of [the Debtor] was paid," and that in early October 2004 Jade "several times" acknowledged that the Debtor's 2004 Plan obligation to Prime was satisfied.[136]  But, Kattula says, he did not get this acknowledgment in writing, because Jade "would not do it."[137]

The Court does not find this testimony by Kattula to be credible  — the Court simply does not believe Kattula's testimony.  And this testimony is at odds with the substantial evidence, discussed in this Opinion, which the Court does find to be credible and persuasive, showing that the Debtor's 2004 Plan obligation to Prime was *not* satisfied in October 2004.

The Debtor's Simovski testified that her main contact at Prime, a Prime employee named Jan,[138] told her that the $1.8 million wire transfer was being applied by Prime to pay off the K&B Cleveland loan, that "TAJ [the Debtor] is cleared," and that "the remainder was applied to other

---

[136]   Kattula (Tr. at Docket # 283) at 11, 20-21.

[137]   *Id.* at 21.

[138]   Prime's internal bookkeeper was Jan Hubler, until she left her employment with Prime in January 2006.  (*See* Testimony of Sandra Rieman ("Rieman") (Tr. at Docket # 519) at 15 (Tr. at Docket # 591) at 116-17; Testimony of Steven Cohen ("Cohen") (Tr. at Docket # 512) at 120).  Ms. Hubler "worked very closely with Mr. Jade."  (Rieman (Tr. at Docket # 591) at 118).  Ms. Hubler did not testify at the evidentiary hearing.

notes that were . . . [outstanding]."[139]  Simovski testified that Prime's Jan told her specifically

that the Debtor's $1.2 million debt to Prime from the 2004 Plan was paid off, and Simovski also

testified that Prime's President Jade told her this as well, in 2006:

> Q  Now when she told you TAJ was done, can -- whether you can
> remember the exact words, what -- what did she mean about TAJ?
>
> A  The -- that that -- that they owed per that plan?
>
> Q  Yes.
>
> A  The 1.2 million. That's where the money was being paid to
> them and it was paid off.
>
> Q  Was she specific about that?
>
> A  Yes.
>
> Q  She mentioned TAJ?
>
> A  Yes. She did mention TAJ.
>
> Q  Did she refer to the -- the 1.2 million dollar debt under the TAJ
> confirmed plan?
>
> A  Yes. And she also linked it to K & B Cleveland.
>
> Q  Okay. And she told you specifically that TAJ plan debt is paid
> in full now?
>
> A  She did and then Mr. Jade did too in 2006.
>
> Q  Mr. Jade told you the same thing?
>
> A  Yes, he did.[140]

Simovski further testified that in August or September 2006, she and Kattula met with

---

[139]  Simovski (Tr. at Docket # 303) at 34-35, 38.

[140]  *Id.* at 39-40; *see also* Simovski (Tr. at Docket # 350) at 79-81, 83.

Prime's Jade at his office, and that during that meeting Jade acknowledged that the Debtor TAJ's debt under the 2004 Plan had been paid off:

> Q  Did the 1.2 million dollar plan obligation of TAJ to Prime come up at that meeting?
>
> A  Yes, it did.
>
> Q  And how did it come up?
>
> A  Because we went through each of the loans and then I went through -- I went through -- I went through each of the loans throughout the years and Mr. -- like just tell him like what -- what I was finding and what I seen was like wrong.  So I wanted to be able to get on a better page and have accurate numbers. And the -- the K & B Cleveland, you know, we went through that breakdown and said okay, there's two things that I want to know about. I said the 1.8 million dollars, what does that take care of. And he said that takes care of TAJ and their obligation under the plan. And I said okay and --
>
> Q  He being Aaron Jade said that to you?
>
> A  Mr. Jade said that to me.
>
> Q  Okay.
>
> A  And then he also told me that -- he said that that takes care of that.
> . . .
>
> Q  So when Jan told you the TAJ plan that was paid and then Mr. Jade told you the plan that was paid, did you believe him?
>
> A  Yes. And it never was brought up after that. I never received a notice, it was never ever brought up.
>
> Q  What was it that was never brought up?
>
> A  The 1.2 million dollar plan obligation that was confirmed.
>
> Q  The TAJ debt?

A  Right.

Q  Never showed up again?

A  No.

Q  In conversation?

A  No

Q  On paperwork?

A  No, it was done.[141]

Simovski also testified that when she met with Jade in 2006, "he asked me why are you bringing up TAJ?  TAJ is done."[142]

The Court does not find any of the foregoing testimony by Simovski to be persuasive. The Court has already found Simovski to be a less than credible witness, and this testimony is not credible.

It is also possible that, at least in part, the foregoing testimony by Simovski may reflect a misunderstanding on her part of what she was told in her conversations with Jade and Prime's internal bookkeeper, Jan Hubler.

Jade credibly testified about meeting at his office with Kattula and Simovski in the third quarter of 2006, and discussing the loans Prime had made to the various Kattula-related entities, including K&B.[143]  Jade testified that during that meeting, Kattula and Simovski "brought up

---

[141]  Simovski (Tr. at Docket # 303) at 42, 44.

[142]  Simovski (Tr. at Docket # 350) at 83.

[143]  Jade (Tr. at Docket # 730) at 50-51 (regarding meeting in the third quarter of 2006 in which PX-18 and PX-19 were discussed).

TAJ Graphics."[144]  Jade was "very surprised" by this, because he had thought that the Debtor had dissolved — "because the plan of the first bankruptcy indicated it would dissolve.  It would be dissolved."[145]

At that time, Jade did have reason to think that the Debtor had dissolved.  The Debtor's 2004 Plan, which was confirmed on September 29, 2004, called for a sale of all the Debtor's assets — a liquidation — following which the Debtor was to be dissolved.[146]  The Debtor's real estate had been sold, and as of his meeting with Kattula and Simovski in the third quarter of 2006, Jade had not yet learned of the alleged October 1, 2004 assignment of assets from K&B to the Debtor.  The 2004 Plan certainly did not call for or contemplate such an assignment of assets by K&B to the liquidating Debtor, and as noted earlier in this Opinion, Jade did not learn of the alleged assignment of assets until late 2007 or 2008.  So Jade had reason to have assumed that the Debtor had liquidated and dissolved.

When Jade was asked about the Debtor in his meeting with Kattula and Simovski, it was his first inkling that the Debtor had not dissolved.  Because of that, Jade caused his attorney to "cc" the Debtor in a notice of default letter dated December 14, 2006, sent to Kattula, K&B, and other Kattula-related entities, regarding defaults under several loans then owing to Prime,

--------

[144]  *Id.* at 69.

[145]  *Id.* at 69-70; *see also* Jade (Tr. at Docket # 755) at 63-64 (based on what the 2004 Plan said, Jade thought in October 2004 that the Debtor was going to dissolve).

[146]  *See* 2004 Plan at 17, § 3.6 (stating that after confirmation, "for the purposes of implementation of the Plan, the Debtor shall exist as a Reorganized Debtor, only for the purpose of implementing documents to facilitate the conveyances and distributions set forth above."); and 38 ("The Debtor will dissolve upon the closing of this Bankruptcy Case.")

64

including the Luna Pier loan.[147]

In any event, the Court does not find that Jade or anyone else from or on behalf of Prime ever told Kattula or Simovski that the Debtor's debt to Prime under the 2004 Plan had been paid in full.

The Debtor also cites as supporting evidence a letter from Prime to Kattula, signed by Jade, and dated June 6, 2006. The letter stated that "[a]t your request we are providing you with the following information that you requested, related to your notes due to Prime Financial for the year 2005." The letter then listed seven notes, including the "K&B Cleveland" note which it said was "paid off in 2004." The letter did not list or mention any note or debt owing from the Debtor to Prime.[148] And Simovski testified that after October 2004, she never saw "any documents from Prime that ever mentioned there being any liabilities at all of TAJ to Prime."[149]

The Court does not view this evidence as tending to show that the Debtor owed no debt to Prime, either as of the date of the June 6, 2006 letter or as of the end of 2005. It is not surprising that in listing the "notes due to Prime," Jade's letter did not list the Debtor's debt. This is because Prime never lent money to the Debtor, and the Debtor never made any promissory notes payable to Prime. Rather, it is undisputed that the Debtor merely guaranteed certain loan debts of K&B to Prime, which guaranty debts were allowed in a certain amount and treated in the Debtor's 2004 Plan.

As further evidence that the Debtor's debt to Prime under the 2004 Plan was paid off, the

---

[147] Jade (Tr. at Docket # 730) at 69-70; PX-25.

[148] PX-24; Simovski (Tr. at Docket # 350) at 84.

[149] Simovski (Tr. at Docket # 350) at 85.

65

Debtor cites the fact that, even though Prime now claims that it was never paid anything on its allowed claim against the Debtor under the 2004 Plan, Prime never made any effort in the Debtor's 2003 bankruptcy case to seek relief for such a payment default under the confirmed 2004 Plan.[150] This is so, even though after the 2003 Case was initially closed on November 1, 2005,[151] the case was reopened twice, on the motion of a different creditor seeking to enforce the confirmed 2004 Plan.[152]

The Court does not find this argument by the Debtor persuasive. First, as it turns out, there was in fact no payment default by the Debtor under the 2004 Plan. The Debtor's payment to Prime under the Plan, in the form of the $468,660.09 wire transfer made on October 4, 2004 discussed above, amounted to a permitted early payment by the Debtor to Prime under the 2004 Plan, and had the effect of putting the Debtor way ahead of the payment schedule it was required to meet under the Plan. As described in detail in Part III.B of this Opinion, the 2004 Plan required the Debtor to make payments to Prime at the rate of approximately $18,000 per month, beginning April 13, 2005, followed by a balloon payment no later than October 12, 2009, in the amount of roughly $1.081 million. The October 4, 2004 wire transfer therefore represented a pre-payment by the Debtor to Prime of more than 26 months of installments due under the 2004 Plan, which meant that the Debtor paid its monthly 2004 Plan payments to Prime covering the

---

[150] *See* Kattula (Tr. at Docket # 350) at 111.

[151] *See* Order Closing Case, filed November 1, 2005 (Docket # 120 in Case No. 03-75414).

[152] The case was reopened for the first time on June 2, 2006. (*See* Order Reopening Case, filed June 2, 2006 (Docket # 133 in Case No. 03-75414)). After that matter was settled, the case was re-closed, on November 17, 2006. The case was reopened a second time on April 2, 2007, on motion of the same creditor, again seeking to enforce the confirmed 2004 Plan. (*See* Order Reopening Case, filed April 2, 2007 (Docket # 146 in Case No. 03-75414)). After that matter was settled, the case was re-closed again, on May 24, 2007.

months through May 2007.

Second, as discussed above, until at least sometime in the third quarter of 2006, Prime's President Jade thought, based on the 2004 Plan, that the Debtor had liquidated its assets, primarily in the form of the Debtor's real estate, and had been dissolved. Only at that point did he have an inkling that perhaps the Debtor had not been dissolved. And until the end of 2007 or early 2008, Jade knew nothing of the alleged transfer of K&B assets to the Debtor that the Debtor now says occurred on October 1, 2004, but which the Debtor had not disclosed in any way to Prime. And even when Jade first learned of the alleged transfer of K&B assets to the Debtor, he did not believe that the transfer had really occurred.

So it is not surprising that Prime did not take action in the Debtor's 2003 case to enforce the Debtor's payment obligations under the 2004 Plan, before the Debtor filed the current Chapter 11 bankruptcy case on October 21, 2009. Prime's failure to take such action does not raise any inference that Prime thought the Debtor's debt to Prime under the 2004 Plan had been paid in full.

**E. Debtor's allegation that even if Prime's $1.2 million claim under the 2004 Plan was not paid in full in October 2004, it was paid in full after that time**

The Debtor alleges that even if Prime's $1.2 million allowed claim under the 2004 Plan was not paid in full by the wire transfers in October 2004, the claim was paid in full by one or more later events. The Court will discuss those theories next.

**1. The alleged payoff of the Luna Pier loan, including via the mortgage foreclosure in 2007**

The Debtor alleges that the Luna Pier loan was paid in full by events that occurred after October 2004. The Debtor alleges several such events, and relies first on the theory that the Luna Pier loan was paid in full by the foreclosure sale of the Luna Pier property (*i.e.*, the real estate

located at 3949 Luna Pier, Erie, Michigan 48133)[153] that was done by Prime, via a sheriff's sale that occurred on December 13, 2007.

### a. Whether the alleged pay down or payoff of the Luna Pier loan is relevant

Before discussing why the Debtor alleges that the Luna Pier loan was paid off, it is necessary to discuss why the Debtor contends that such alleged payoff is relevant here — that is, why the Debtor says it shows that the Debtor's debt to Prime under the 2004 Plan was paid.

As described in Part III.D of this Opinion, the Debtor's debt to Prime originally consisted only of the Debtor's guarantee of repayment by K&B of two loans K&B had obtained from Prime — the K&B Cleveland loan and the Luna Pier loan. Prime's $1.2 million allowed claim in the 2003 Case was based on these two loan guaranties, and nothing else. As described in Part III.D.1 of this Opinion, it is undisputed that the K&B Cleveland loan was paid in full by the GEM wire transfer to Prime on October 1, 2004. The Debtor argues that *if* the Luna Pier loan *also* was paid in full at any time, then the Debtor has succeeded in proving that its debt to Prime under the confirmed 2004 Plan was paid in full.

Prime's response to these arguments is multi-layered. First and foremost, Prime says that the Luna Pier loan was never paid in full, and that a substantial balance is still owing by K&B on that loan. Second, Prime agrees that the Debtor's debt to Prime consisted only of guaranties of loans owing to Prime by other Kattula-related parties, rather than direct, primary liability on any loans.[154] But Prime argues that the Debtor guaranteed more loans than just the K&B Cleveland

---

[153] For the address and legal description of the Luna Pier property, see PX-217 (Sheriff's Deed) at 1, 2; PX-10 (Mortgage) at 1 and Ex. A.

[154] *See, e.g.*, Jade (Tr. at Docket # 755) at 45-46.

68

09-72532-tjt    Doc 1125    Filed 04/19/19    Entered 04/19/19 16:48:01    Page 68 of 105

loan and the Luna Pier loan. Prime argues that the Debtor guaranteed several other loans that

Prime made to K&B and other Kattula-related entities.[155] Third, Prime does concede, however,

that if all of the loans that (according to Prime) the Debtor guaranteed were paid off, then the

Debtor's debt to Prime under the 2004 Plan should be deemed to be paid off as well. Prime's

President, Jade, testified that he agrees with this limited concession,[156] and Prime made this

limited concession in its oral closing argument.[157]

As the Court will discuss, this limited concession is one that Prime did not have to make

under applicable law. But it is a concession that is premised on the Debtor having guaranteed all

of the loans that Prime made to K&B, Kattula, and other Kattula-related entities, not just the

K&B Cleveland loan and the Luna Pier loan. Prime has not actually conceded the Debtor's

rather different argument. The Debtor's argument is that if the Court finds that the Debtor

guaranteed only the two loans (the K&B Cleveland loan and the Luna Pier loan), then if those

two loans in fact were paid off, the Debtor's debt to Prime under the 2004 Plan must be deemed

fully paid.

The Court resolves these issues as follows. **First**, the Court finds that the only loan that

the Debtor guaranteed *and* that arguably remains unpaid is the Luna Pier loan. The parties agree

that the Debtor guaranteed the Luna Pier loan, and the Court has so found, as stated in Part III.D

of this Opinion. The parties agree that the Debtor also guaranteed the K&B Cleveland loan, but

they also agree (and the Court has found) that the K&B Cleveland loan was paid in full by the

---

[155] *See, e.g.*, *id.* at 59-61.

[156] *See id.* at 55-56, 58, 67, 68.

[157] *See* Tr. (Docket # 922) at 23-25 (oral closing argument by Prime's counsel).

69

October 1, 2004 wire transfer.

Prime has argued that the Debtor guaranteed other loans, but the Debtor disputes that. Specifically, Prime argues, based on Jade's testimony and certain exhibits, that the Debtor guaranteed the following other loans made by Prime, which remain unpaid. (This list excludes loans that Prime admits have been paid off): Waste Path II loan; and K & B Plus loan.[158] But the Court finds that the Debtor did not guarantee these other loans.

The K & B Plus loan was a loan in the amount of $415,000 made by Prime to K&B on March 23, 2004. That loan was guaranteed by Kattula and his wife Maria Kattula and two Maria Kattula trusts.[159] The Waste Path II loan was a loan in the amount of $650,000 made by Prime to K&B, Kattula, and three other Kattula-related entities on October 21, 2004.[160] Neither loan was guaranteed by the Debtor.

The evidence in the record shows that before filing its 2003 bankruptcy case, the Debtor signed two Guaranty Agreements (the "Pre-Petition Guaranties"). In the first of these, dated December 13, 2001, the Debtor guaranteed payment of a $525,000 loan by Prime to K&B, which loan later became part of the K&B Cleveland loan.[161] In the second of these guaranties, dated August 19, 2003, the Debtor guaranteed payment of the K & B Cleveland loan (the $1.425 million loan by Prime to K&B).[162] In each of the Pre-Petition Guaranties the Debtor guaranteed

---

[158] *See* Jade (Tr. at Docket # 755) at 59-61; Jade (Tr. at Docket # 682) at 66-69 (K & C Group loan was paid off in April 2005); *see also* PX-127; Rieman (Tr. at Docket # 519) at 39-40.

[159] Loan documents for the K & B Plus loan are at PX-74.

[160] Loan documents for the Waste Path II loan are at PX-77.

[161] PX-212 at Bates page 02395; Jade (Tr. at Docket # 682) at 46-47.

[162] This Guaranty Agreement is contained in PX-13.

payment not only of the specific loans made at the time, but also of all "Obligations" of K&B to Prime, which was defined to include all debts of K&B to Prime, "whether now existing or hereafter arising."

In addition to the two Pre-Petition Guaranties, which the Debtor signed before filing its 2003 bankruptcy case, the Debtor signed a document entitled "Reaffirmation of Guaranty Agreement" dated March 23, 2004 (the "Post-Petition Guaranty Reaffirmation").[163]  This document was signed in connection with Prime's March 23, 2004 loan to K&B, described above as the K & B Plus loan.  This document was signed while the Debtor's 2003 bankruptcy case was pending and before the 2004 Plan was confirmed.  In this document, the Debtor, along with other guarantors, "reaffirmed" its August 19, 2003 guaranty of the K & B Cleveland loan.

Prime argues that the Debtor also guaranteed the debts of the other Kattula-related entities, in three other documents that were signed after the Debtor filed its 2003 bankruptcy case.  These were (1) a document entitled "Cross Collateralization/Cross Default Agreement" dated October 10, 2004;[164] and (2) a document entitled "Mortgage Modification Agreement" dated January 7, 2005; and (3) an undated document entitled "Cross Collateralization/Cross Default Agreement" that was signed on March 10, 2004.[165]  Prime's Jade testified that in his opinion, by these documents, the Debtor guaranteed all loans that it had previously guaranteed,[166] and specifically that the Debtor guaranteed the Waste Path II loan described above, and also a

---

[163]  This Written Guaranty is contained in PX-74.

[164]  PX-42; Jade (Tr. at Docket # 682) at 47.

[165]  These last two documents are contained in PX-78.

[166]  Jade (Tr. at Docket # 695) at 36-37; Jade (Tr. at Docket # 721) at 45-46.

71

loan known as the Waste Path III loan.[167]  (The Waste Path III loan was a loan Prime made to

Kattula, K&B, and other Kattula-related entities in the amount of $480,309.88 on April 12, 2005,

which loan was later increased to $750,000.00 on May 10, 2005).[168]

But none of the language of any of these three documents imposes any liability on the

Debtor, by any guaranty or otherwise.  And even if there was such language in any of these

documents, it would not be binding on the Debtor, because these documents were not signed by

the Debtor.

Under the wording of the Pre-Petition Guaranties and the Post-Petition Guaranty

Reaffirmation, discussed above, the Debtor guaranteed not only existing debts of K&B to Prime,

but also all future debts of K&B to Prime.  But the Debtor's guaranties to Prime all predated

confirmation of the Debtor's 2004 Plan in the 2003 bankruptcy case.  (That Plan was confirmed

on September 29, 2004).  All of these guaranties — the two Pre-Petition Guaranties and the Post-

Petition Guaranty Reaffirmation that merely "reaffirmed" one of the Pre-Petition Guaranties —

were the basis for Prime's claim against the Debtor in the 2003 bankruptcy case.[169]  They gave

---

[167]  *See* Jade (Tr. at Docket # 755) at 62, 63-65.

[168]  Loan documents for the Waste Path III loan are at PX-78.

[169]  The Court construes the Post-Petition Guaranty Reaffirmation as not imposing any new guaranty obligation on the Debtor.  Rather, the Court construes it as merely the Debtor's agreement that its liability under the Pre-Petition Guaranty dated August 23, 2003, which was contingent and unliquidated, was not affected or impaired by the fact that additional guarantors had joined in guaranteeing the K & B Cleveland loan.  (*See* the Post-Petition Guaranty Reaffirmation (contained in PX-74) at p. 1, Recitals A and B).  If the Court construed this document as itself imposing any new guaranty obligation on the Debtor, the Court would find it to be ineffective, because it would amount to the Debtor incurring a post-petition debt outside of the ordinary course of business, without obtaining the necessary approval of the Court.  *See* 11 U.S.C. §§ 364, 549(a), 105(a); *cf.* the discussion of § 363 in Part III.D.1.a of this Opinion.  The Debtor did not seek or obtain this Court's approval to sign the Post-Petition Guaranty Reaffirmation.  And no notice was given and no hearing was held about it.

Prime a contingent, unliquidated claim in the 2003 bankruptcy case. *See* 11 U.S.C.

§ 101(5)(A) (defining a "claim" to include a right to payment that is "unliquidated" and

"contingent"). The claim was contingent upon K&B failing to repay its loans from Prime when

due, something that had not yet happened; and the claim was unliquidated because the amount of

the Debtor's liability could not be known unless and until the foregoing contingency occurred.

As described in Parts III.B and III.D of this Opinion, Prime's contingent, unliquidated claim was

compromised, allowed in a liquidated amount, and treated in the 2004 Plan. That, in turn,

eliminated the Debtor's then-existing guaranties to Prime for any of the debts of K&B, including

future debts of K&B.

Confirmation of the 2004 Plan gave Prime an allowed $1.2 million claim against the

Debtor, and a fixed right to payment of that claim, with interest, amount according to the

schedule set forth in the 2004 Plan. The Debtor's debt to Prime no longer was in the nature of a

guaranty. Prime's liquidated, non-contingent $1.2 million claim under the 2004 Plan was

substituted for the previous contingent, unliquidated claim Prime had based on the Debtor's

guaranties of the K&B debt. As a result of that substitution, it no longer mattered whether or

when K&B defaulted on any of its loans from Prime, or how much K&B continued to owe Prime

on those loans. The Debtor's debt to Prime was fixed and no longer contingent in any way on

such things.

This conclusion is compelled by both case law and the terms of the 2004 Plan. In

sections that apply to Prime, among other creditors, the confirmed 2004 Plan stated, in pertinent

part, the following:

> Except as provided in this Plan, the confirmation of this Plan shall,
> and does hereby act to discharge and release the Claims of all

73

Creditors and all Interests against the Debtor and the Reorganized Debtor, **the same constituting a full, total and complete settlement with said Creditors** and Interest Holders. **Except as provided in this Plan, confirmation shall also act as a merger and relinquishment of any and all Claims that Creditors have, or may have, against the Debtor and the Reorganized Debtor** as provided in the treatment of the Creditors in Articles II and III.[170]

. . .

As of the Confirmation Date, except as provided in this Plan or the Confirmation Order, and except as to filing fee applications, if necessary, for Professional Fees and except as to any Claims for which the Bankruptcy Court has entered a separate bar date, **all entities shall be precluded from asserting against the Debtor or the Reorganized Debtor**, their successors or their property, **any other or further claims, debts, rights, causes of action, liabilities or equity interests based upon any act, omission, transaction or other activity of any nature that occurred prior to the Confirmation Date.**[171]

Case law, including cases discussing the *res judicata* effect of a confirmed Chapter 11 plan, confirms this effect of the 2004 Plan on Prime's claim against the Debtor:

Confirmation, then, had the dual effect of discharging the Petitioning Creditors' preconfirmation debt **and replacing it with their Plan Claims.** *See In re Benjamin Coal Co.*, 978 F.2d 823, 827 (3d Cir.1992) ("O]nce the reorganization plan is approved by the bankruptcy court, each claimant gets a 'new' claim based upon whatever treatment is accorded to it in the plan itself.") The plan is essentially a new and binding contract between the Reorganized Debtor and the Petitioning Creditors. *In re Xofox Indus. Ltd.*, 241 B.R. 541 (Bankr. E.D. Mich. 1999). *See also Guardian Savings and Loan Assoc. v. Arbors of Houston Assocs. Ltd. Partnership* (*In re Arbors of Houston Assocs. Ltd. Partnership*), 172 F.3d 47, 1999 WL 17649, *3 (6th Cir.1999) (unpublished table decision) ("A

---

[170] 2004 Plan at 21-22, Article V, § 5.1 (emphasis added). The Plan was amended prior to confirmation to provide that this section 5.1 did not apply to "the State of Ohio, Office of the Attorney General and/or the Environmental Enforcement Section." (2004 Plan Amendments at 5, ¶ 19).

[171] 2004 Plan at 22, Article V, § 5.3 (emphasis added).

74

> plan of reorganization, which resembles a consent decree, is akin to
> a contract between a debtor and its creditors that is approved by the
> bankruptcy court.").  Confirmation of the plan is a final judgment
> that is entitled to res judicata effect.  *Still v. Rossville Bank* (*In re
> Chattanooga Wholesale Antiques, Inc.*), 930 F.2d 458 (6th
> Cir.1991).

*Nat'l City Bank v. Troutman Enters., Inc.* (*In re Troutman Enters., Inc.*), 253 B.R. 8, 11 (B.A.P.

6th Cir. 2000) (emphasis added); *see also In re Nylon Net Co.*, 225 B.R. 404, 406 (Bankr. W.D.

Tenn. 1998) (citations omitted) (emphasis added) ("It is well settled that . . . confirmation of a

plan of reorganization . . . **substitutes the obligations of the plan for the pre-confirmation**

**debts**.  The chapter 11 plan becomes a binding contract between the debtor and its creditors and

governs their rights and obligations.")

This substitution-of-claim effect of the 2004 Plan also follows from the fact that once the

2004 Plan was confirmed on September 29, 2004, both the Debtor and Prime were bound by the

confirmed 2004 Plan, under 11 U.S.C. § 1141(a), and under case law giving the confirmation

order *res judicata* effect.  *See, e.g., Browning v. Levy*, 283 F.3d 761, 772 (6th Cir. 2002).

It follows from all of this that Prime's claim under the 2004 Plan cannot be deemed paid

or reduced by any later payments made to Prime by or on behalf of any party other than the

Debtor, or by the reduction of *other* Kattula-related debts owing to Prime, including any payment

on or other reduction of the Luna Pier loan that the Debtor originally guaranteed.  For this reason,

it does not matter whether or to what extent the Luna Pier loan was paid down or paid off, after

confirmation of the Debtor's 2004 Plan.  It is undisputed that the Debtor itself made no payments

to Prime on the Luna Pier loan.  So with respect to Prime's claim against the Debtor, based on

the 2004 Plan, the Debtor is entitled to no credit for any such payments or credits that were made

or due to be given on the Luna Pier loan.

**b. The extent to which the Luna Pier loan was paid down**

**i. The numbers**

The Debtor alleges that the Luna Pier loan was paid off, or must be deemed paid off. Prime disputes that. But for the reasons discussed above, the Court has concluded that this dispute about the Luna Pier loan is not relevant. Prime's claim against the Debtor is unaffected by whether, or to what extent, the Luna Pier loan was paid down.

But in any event, the Court also rejects the Debtor's allegation that the Luna Pier loan was paid off. Rather, as explained below, the Court finds that while payments were made on the Luna Pier loan after confirmation of the Debtor's 2004 Plan (though not by the Debtor), the Luna Pier loan was never paid off, and in fact, the balance owing to Prime on that loan never fell below $987,000. And the balance owing to Prime on the Luna Pier loan as of the October 21, 2009 date on which the Debtor filed the current bankruptcy case, including interest, was over $1.3 million.

After K&B defaulted on the Luna Pier loan, Prime foreclosed on its mortgage securing that loan, against the Luna Pier real estate. This was a foreclosure by advertisement, as permitted and governed by Michigan law. *See* Mich. Comp. Laws Ann. § 600.3201, *et seq.* The sheriff's foreclosure sale took place on December 13, 2007. Prime was the successful bidder at the foreclosure sale, and the purchase price was $325,000.00. K&B did not redeem the Luna Pier property within the applicable one-year statutory redemption period, as permitted by Mich. Comp. Laws Ann. § 600.3240.[172] So Prime then became the owner of the Luna Pier property,

---

[172] Jade (Tr. at Docket # 721) at 59.

under Mich. Comp. Laws Ann. § 600.3236.[173]

The Court finds that at the end of December 2007, K&B owed Prime a balance of $1,312,061.73 on the Luna Pier loan, without yet crediting the $325,000.00 credit bid that Prime made at the December 13, 2007 foreclosure sale. After that credit is applied, the Luna Pier loan balance became $987,061.73, as of the end of 2007. This balance reflects credits given in 2006 and 2007 to reduce the Luna Pier loan balance, under the agreement known as the MOU, which is discussed later in this Opinion. Those credits totaled $302,744.00 in 2006 and $97,410.71 in 2007, for a total of $400,154.71 in such credits.[174] Other than these credits under the MOU, Prime received no payments on the Luna Pier loan from Kattula, K&B, or any other Kattula-related entities after May 2005.[175]

So, the Court finds that the balance owing to Prime on the Luna Pier loan was $987,061.73 as of the end of 2007. After that time, interest continued to accrue on the Luna Pier loan balance, at the contractual default rate of 19% per annum,[176] and the balance owing to Prime on the Luna Pier loan as of October 21, 2009, when the Debtor filed the current bankruptcy case,

---

[173] *See also* Jade (Tr. at Docket # 784) at 30.

[174] The findings and numbers in this paragraph of this Opinion are derived from the loan history for the Luna Pier loan contained in PX-128, third page. (*See also* PX-20 at ¶ 7d; PX-127; Rieman (Tr. at Docket # 519) at 39-40). The PX-128 loan history was prepared by Sandra Rieman, and discussed in her testimony. (Rieman (Tr. at Docket # 519) at 35-36, 37, 39, 63). It should be noted that to the extent the Luna Pier loan history in PX-128 indicates that the sheriff's foreclosure sale occurred in December 2008 and that Prime's credit bid was $350,000, it is incorrect. The sheriff's sale occurred on December 13, 2007, and the credit bid was $325,000. (PX-217, first page (Sheriff's Deed); Jade (Tr. at Docket # 682) at 66; Jade (Tr. at Docket # 721) at 55).

[175] *E.g.*, Jade (Tr. at Docket # 721) at 50.

[176] *See* Jade (Tr. at Docket # 755) at 35 (discussing DX-D, second page); see PX-9 (Luna Pier loan promissory note) at 1, 3 (interest rate upon an Event of Default to be 2% greater than the non-default rate of 17% per annum).

was at least $1,325,664.47. This amount does not include reimbursement for certain real estate tax payments and legal fees the Prime says it is entitled to under the Luna Pier loan documents.[177] This $1,325,664.47 amount is only very slightly less — 2.24 % less — than the $1,356,044.45 balance owing by the Debtor on Prime's claim under the 2004 Plan as of the October 21, 2009 petition date, as calculated by the Court in Part III.D.2 of this Opinion.

## ii. The Debtor's argument that the Luna Pier loan must be deemed paid in full because of the 2007 foreclosure

In calculating the balance owing on the Luna Pier loan above, the Court is rejecting the following argument made by the Debtor. The Debtor argues that the Luna Pier loan must be deemed paid in full, or nearly so, based on Mich. Comp. Laws Ann. § 600.3280. The Debtor argues that the Luna Pier property was worth substantially more than the $325,000 that Prime purchased the property for in the 2007 foreclosure sale. The Debtor asserts that the Luna Pier property was worth at least $1 million,[178] so that the Luna Pier loan must be credited in this amount, rather than only in the amount of Prime's $325,000 credit bid.

The Debtor's argument is based on Mich. Comp. Laws Ann. § 600.3280, which states, in pertinent part:

> When, in the foreclosure of a mortgage by advertisement, any sale of real property has been made . . . or shall be hereafter made by a mortgagee, trustee, or other person authorized to make the same pursuant to the power of sale contained therein, at which the mortgagee . . . thereby secured has become or becomes the purchaser, . . . and thereafter such mortgagee . . . shall sue for and undertake to recover a deficiency judgment against the mortgagor, trustor or other maker of any such obligation, or any other person

---

[177] *See* Jade (Tr. at Docket # 755) at 33-36 (discussing DX-D, second page).

[178] *See, e.g.*, Testimony of Seymour Adler ("Adler") (Tr. at Docket # 811) at 10.

78

liable thereon, it shall be competent and lawful for the defendant against whom such deficiency judgment is sought to allege and show **as matter of defense and set-off to the extent only of the amount of the plaintiff's claim, that the property sold was fairly worth the amount of the debt secured by it at the time and place of sale or that the amount bid was substantially less than its true value,** and such showing shall constitute a defense to such action and shall defeat the deficiency judgment against him, either in whole or in part to such extent. . . .

(emphasis added). The effect of this statute is that "[u]nder Michigan law, when a creditor forecloses by advertisement, the borrower's debt is reduced to the extent of the 'true value' of the property, even if the actual foreclosure sale price was lower than that." *DAGS II, LLC v. Huntington Nat'l Bank*, 865 F.3d 384, 387-88 (6th Cir. 2017).

As discussed in Part III.C.2 of this Opinion, in this case the Debtor bears the burden of proving its objection to Prime's claim, by a preponderance of the evidence. This is so because in this context, the burden of proof is what it would be outside of bankruptcy, under applicable nonbankruptcy law. As explained earlier, the Claim Objection is in the nature of a defense of payment, and such a defense is an affirmative defense under applicable Michigan law, on which the party asserting the defense bears the burden of proof.

The same burden of proof applies to the Debtor's argument under Mich. Comp. Laws Ann. § 600.3280. Under Michigan law, a party defending against a deficiency judgment based on § 600.3280 has the burden of proving that on the day of the foreclosure sale, the foreclosed property had a value greater than the foreclosure sale price, and the extent by which such value exceeded the price. *See Bayview Loan Servicing , L.L.C. v. Batch*, No. 09-14528, 2010 WL 4024754, at *3 & n.1 (E.D. Mich. Oct. 13, 2010) (citing *Stewart v. Eaton*, 283 N.W. 651, 658 (Mich. 1939)).

79

The Debtor has not met its burden of proving, by a preponderance of the evidence, that on the day of the December 13, 2007 foreclosure sale, the Luna Pier property had a value greater than the $325,000.00 foreclosure sale price.

The evidence regarding the value of the Luna Pier property includes the following.

There was evidence of two appraisals that were done on the Luna Pier property, well before the date of the December 13, 2007 foreclosure sale. One was done in 2002 and one was done in early 2006. No appraiser testified, but excerpts from two written appraisal reports were admitted into evidence. The first such report was dated August 6, 2002 and was done by Joseph M. Leutze, and was performed at the request of Prime and Comerica Bank.[179] It opined that as of July 26, 2002, the Luna Pier property had an "As Is" market value of $1.2 million ("Real Estate Only").[180] This appraisal pre-dated the foreclosure sale by 5 years and 4 months.

The second appraisal was dated February 16, 2006, and was done by Joe Anderson and Kent M. Krause of Petroval. It was performed for BLX Capital, LLC, not for Prime.[181] It opined that as of February 13, 2006, the Luna Pier property had an "As Is" market value of $1.24 million.[182] This appraisal pre-dated the foreclosure sale by almost 2 years (1 year and 10 months).

Kattula testified, vaguely, that "there is a formal appraisal done by a company in

---

[179] DX-AX; Jade (Tr. at Docket # 798) at 10.

[180] DX-AX, letter of transmittal at 3. The appraisal also projected a market value upon completion ("Prospective upon Completion"/"Real Estate Only") of $2.75 million. *Id.*

[181] DX-AY.

[182] *Id.* at 1. This appraisal also projected a "Prospective Market Value at Completion" of $5.17 million and a "Prospective Market Value at Stabilization" of $7.1 million. *Id.*

Colorado under direction of the bank of $5.5 million "after we open the truck stop."[183]  And he testified that "there is an email" from "the CPA [Steven Cohen]" to Jade "stating that he has a client," named "Jim" who "was willing to buy it" for $1.8 million.  He then testified that [h]e g[a]ve him an offer for [$1.8 million] for a vacant lot. And he said he was going to try and – he was going to tear down the current building. And still he was willing to pay [$1.8 million] or [$1.6 million], I – I don't recall the number."[184]

This testimony by Kattula is too vague to have any probative value.  Kattula's testimony about the alleged $5.5 million appraisal was very vague and incomplete.  Kattula did not present any documentation about this alleged appraisal.  And it was by an unnamed appraiser, with no stated date, no information about how this appraiser came to this opinion of value, and with no further details, except that it obviously was an appraisal of the projected future value of the Luna Pier property, *after* it had been built and developed into an operating truck stop.

As to Kattula's testimony about the alleged offer from "Jim" to purchase the vacant land, no written offer or written evidence of such an offer was ever offered as an exhibit.  And Kattula's testimony about this alleged offer is lacking crucial details, including the date of the offer, the precise amount of the offer, and the conditions and contingencies in the offer.

There was some additional evidence presented about this person named Jim, who allegedly was willing to buy the Luna Pier property.  Steven Cohen sent an e-mail to Jade on August 30, 2006, which stated that "Jim" would be willing to pay $1.5 million for the Luna Pier property.  This willingness by "Jim" was subject to numerous conditions.  Cohen's e-mail stated:

---

[183]  Kattula (Tr. at Docket # 643) at 7-8.

[184]  *Id.*

81

> I spoke with Jim and he said he has done some research regarding
> the property.  He thinks he may have to tear down the partial
> structure that is up, and his concerned about the age and condition
> of the existing tanks, and other issues.  Regardless, **if all of the
> permits, easements, city issues, water/sanitary problems, and
> other items that were discussed have been resolved**, as Bob has
> indicated to you, he would be willing to pay $1,500,000 for the
> property.  You can let Bob know too.[185]

Jade testified that he let Kattula know about this.  Then a purchase offer of some kind was

received, for $1.3 million.  (That purchase offer is not in evidence; it was never offered as an

exhibit).  Jade testified that "when we received the actual purchase offer, I showed it to [Kattula]

and it was for [$1.3 million] and [Kattula] thought it was too low and rejected it out of hand."[186]

Jade thought that this "was a mistake" by Kattula,[187] and told Kattula so, and that Kattula should

take this offer.  At the time, Jade thought this was "a fair offer," in part because of how it

compared to what K&B owed to Prime on the Luna Pier loan.[188]  No evidence was presented of

the date of this $1.3 million offer from "Jim," but presumably it was very soon after the date of

Steven Cohen's August 30, 2006 e-mail, quoted above.

Jade testified that after K&B purchased the Luna Pier property in 2002, it had done

virtually nothing to construct a truck stop at the site.  "Other than taking the storage tanks out and

leaving . . . a mess," Kattula and K&B had done nothing to improve the site and had constructed

nothing.[189]  While the Debtor presented some evidence that K&B had spent money in 2004 to

---

[185]  DX-AH (emphasis added).

[186]  Jade (Tr. at Docket # 784) at 96.

[187]  *Id.*; *see also* Jade (Tr. at Docket # 798) at 15-16.

[188]  *See* Jade (Tr. at Docket # 798) at 15-16.

[189]  *Id.* at 32.

2006 on site development for the Luna Pier property, there was no credible evidence that these expenditures had increased the market value of the Luna Pier property.[190]

Jade further testified that after the February 2006 appraisal, in mid- to late-2007, the United States economy worsened significantly, and specifically, "[h]ousing values plummeted. And commercial properties and especially vacant land plummeted as well, maybe even more so."[191]

Jade testified that he calculated the $325,000 amount of the bid that Prime made at the foreclosure sale as follows. He obtained a written appraisal of the Luna Pier property from Integra Realty Resources, which appraised the land only (disregarding existing structures on the land) dated October 12, 2007, which stated a value of $250,000. In appraising the value of the land only, this appraisal did not include anything for the value of "the shell of a building" that was then on the land.[192] According to Jade, this October 2007 appraisal "was based on economic conditions after the crash."[193] Jade then added $75,000 to the $250,000 appraised land value, to account for the building, to come up with the $325,000 bid amount.[194]

Jade's testimony strongly indicates that the market value of the Luna Pier property had

---

[190] *See* Adler (Tr. at Docket # 811) at 13-14 (discussing "Adler 4").

[191] *Id.*

[192] Jade (Tr. at Docket # 721) at 55; PX-205. The Integra appraisal, PX-205, was admitted into evidence only for the limited purpose of showing why and how Jade calculated the foreclosure sale bid price of $325,000 that Prime made for the Luna Pier property. This appraisal was not offered by Prime, and was not admitted, for the purpose of showing what the actual value of the Luna Pier property was at the time of the foreclosure sale. (*See* Tr. at Docket # 721 at 57-59).

[193] Jade (Tr. at Docket # 798) at 33.

[194] Jade (Tr. at Docket # 721) at 55.

"plummeted" starting in mid-2007, due to worsened economic conditions. He further testified

that the date of the February 2006 appraisal was at "the height of the economic cycle" whereas

the October 2007 appraisal was "probably getting close to the lull of the economic cycle."[195] And

Jade's testimony also indicates that the age of the 2002 and February 2006 appraisals discussed

above made them unreliable indicators of the value of the Luna Pier property as of the

foreclosure sale date. Jade testified that "no appraisal will be recognized by anyone unless it's

anywhere from six months to a year prior to."[196] (The appraisals were 5 years and 4 months, and

almost 2 years, before the date of the foreclosure sale, as noted above.)

Jade's testimony also explains why the $1.3 million purchase offer from "Jim," dating

from late August 2006, is not a reliable indicator of the value of the Luna Pier property at the

time of the December 13, 2007 foreclosure sale.[197]

None of this testimony by Jade was contradicted by any evidence presented by the

Debtor.[198] And Jade's testimony explains why all of the evidence offered by the Debtor of the

value of the Luna Pier property is insufficient to prove, by a preponderance of the evidence, that

the value of the Luna Pier property *at the time of the December 13, 2007 foreclosure sale*, was

---

[195] *Id.* at 49.

[196] *Id.* at 48.

[197] *See also* Testimony of Gerald Gabriel ("Gabriel") (Tr. at Docket # 870) at 98 (this 2006 purchase offer was made "before the real estate market tanked.").

[198] The Debtor's accounting expert, for example, who is not an expert on real estate values or appraising real estate, testified that he was not in a position to argue with Jade's testimony that property values fell substantially in 2007. (*See* Adler (Tr. at Docket # 830) at 73). Adler tried to argue from the $250,000 Integra appraisal, obtained by Jade in October 2007, that the appraisal implied that property values had *not* fallen in 2007, but Adler's reasoning on this point is unpersuasive. (*Id.* at 73-75). The Integra appraisal (PX-205) does not say or imply this.

greater than the $325,000 sale bid amount, and if greater, how much greater. The Debtor has failed to meet its burden of proof under Mich. Comp. Laws Ann. § 600.3280.

### 3. The "MOU" transaction

The Debtor argues that its debt to Prime must be deemed to have been paid based on an agreement entitled "Memorandum of Understanding" (the "MOU") which was signed on November 16, 2005. But the Court rejects this argument, for the reasons discussed below.

The MOU was one of many related restructuring agreements made by Prime and related entities on the one hand, and Kattula and Kattula-related entities on the other hand. Most of these agreements were signed on November 16, 2005, and became effective on December 1, 2005.[199] In combination, these agreements, which this Opinion will refer to collectively as the "MOU transaction," represented a substantial and complex restructuring of the debts owing to Prime by Kattula, K&B, and Kattula-related entities. But this restructuring did *not* restructure or change the Debtor's debt to Prime under the confirmed 2004 Plan.

Among other things, the MOU transaction restructured three loans that Prime had made to Kattula and Kattula-related entities, including K&B, Kattula, and a Kentucky entity named Waste Path Sanitary Landfill, LLC ("Waste Path"), which conducted a landfill operation in Kentucky. These loans were known as Waste Path I, Waste Path II, and Waste Path III. (The latter two loans are discussed earlier in this Opinion.) Some of the parts of the MOU transaction were: (1) a change in ownership of the membership interests in Waste Path, so that the membership became owned 90% by Calvert Properties, LLC (which was 100% owned by Jade,

---

[199] PX-84; *see* Jade (Tr. at Docket #709) at 46, 47. Kattula admits signing all of the MOU-related agreements contained in PX-84. (Kattula (Tr. at Docket # 675) at 39).

the 100% owner of Prime) and 10% each by Dan Sills and Joy Hubb; (2) a transfer of roughly

600 acres of land surrounding the Kentucky landfill, from U.S. Environmental Management,

LLC to Prime Calvert, LLC (which was 100% owned by Prime); (3) a transfer of equipment used

to operate the landfill, to Calvert Machinery, LLC (which was owned 100% by Prime); (4) an

assumption by the foregoing three Prime-related entities (Calvert Properties, LLC; Prime Calvert,

LLC; and Calvert Machinery, LLC) of $1.77 million of the debt owed by Kattula, K&B, and

Waste Path to Prime, on the Waste Path I, Waste Path II, and Waste Path III loans. This

assumption of debt reduced the total debt owed by Kattula, K&B, and Waste Path to Prime on

these three loans by $1.77 million.[200]

Of the many documents executed as part of the MOU transaction (copies of which are

contained in PX-84), the MOU itself was an agreement signed only by Kattula personally, on the

one hand, and Jade, on behalf of Calvert Properties, LLC. The MOU is quoted below. But most

relevant here is that the MOU contained provisions for how the revenue from the operation of

Waste Path would be spent in the future.

The MOU contained five prioritized tiers for the allocation of Waste Path's annual

revenue. Two of those tiers are the subject of the dispute discussed in this Opinion below. The

**third** of these tiers allocated the annual revenue of Waste Path, to the extent any revenue was left

after payment of the first two tiers, to pay sums necessary to bring current all the outstanding

promissory notes payable to Prime, including the note for the Luna Pier loan. Such sums

---

[200] *See* Jade (Tr. at Docket # 709) at 30-33; *see also* Schneiderman (Tr. at Docket # 377) at 22
(purpose of the MOU transaction "was to restructure the debt of Waste Path [I, II, and III] loans and
to restructure the ownership of Waste Path that was transferred – which was part of the collateral
of Waste Path [I, II, and III] .")

"includ[ed] all interest, fees and costs associated in bringing the Notes current."  The **fifth** of these MOU tiers allocated Waste Path's annual revenue, to the extent any revenue was left after payment of the first four tiers, to be shared between Calvert Properties, LLC and Kattula, basically on a 50-50 basis.

The MOU is quoted below, in its entirety.[201]

### MEMORANDUM OF UNDERSTANDING

This Memorandum of Understanding is made this 16th day of November 2005, by Calvert Properties, LLC, a Kentucky Limited Liability Company and Robert Kattula, Individually.

### RECITALS:

A.      This Memorandum of Understanding sets forth the monetary sharing arrangement regarding Waste Path Sanitary Landfill, LLC ("WPSL") between Calvert Properties, LLC, a Kentucky Limited Liability Company ("CP") and Robert Kattula.

NOW THEREFORE THE PARTIES AGREE AS FOLLOWS:

ln consideration of U.S. Environmental Management, LLC agreeing to execute a deed to Prime Calvert, LLC, a Kentucky Limited Liability Company for the 600 +/- acres of vacant land in Kentucky, and in further consideration of K & B Capital, LLC agreeing to cancel a certain Promissory Note executed by WPSL in favor of K & B, LLC, dated September 9, 2004, CP (which is owned or controlled by the same party as Prime Calvert, LLC) has agreed to share in the profits of the sale or operation of the Waste Path business.  The profits will be shared as follows:

I.      **SHARING ARRANGEMENT DURING WPSL NORMAL OPERATIONS.**

1      The annual revenue of WPSL shall be

---

[201]  PX-28; PX-84 at Tab 2.  In the quotation of this exhibit, underlining and non-italicized bolding are in the original.

allocated in the following order

A.  First: to all operating expenses, costs and working capital necessary to operate WPSL;

B.  Second, to any outstanding indebteduess owing by WPSL to any third party creditors;

C.  Third: to Prime Financial, Inc., ("Prime") an amount necessary to bring current all outstanding Notes due Prime from Robert Kattula, WPSL, LLC, Bluegrass Incineration Services, LLC, U.S. Environmental Management, LLC, K & B Capital, LLC, Robert Kattula, Individually, or any entity affiliated with Robert Kattula or the above entities (~~not~~ ***to*** includ~~eing~~ a certain $1,250,000.00 Promissory Note executed by K & B Capital, LLC and Robert Kattula dated 9/30/02, as amended, in favor of Prime), including all interest, fees and costs associated in bringing the Notes current. Outstanding Notes shall include all notes of the above parties which have been assigned in whole or in part.

D.  Fourth: to Prime, in monthly payments necessary to keep current all notes, (including assigned notes), now or later existing, until said notes are paid in full.  Prime agrees that all outstanding notes due it, as well as all assigned notes will bear interest at the rate of seventeen (17%)  percent and be subject to a payment schedule using a ten (10) year term and amortization.

E.  Fifth: all other revenue received by CP, (except as needed for CP operating expenses, including but not limited to legal and accounting fees) from the operation of WPSL shall be shared as follows:

88

Calvert Properties, LLC - 50%
Robert Kattula - 50%

II.      **SALE OF WPSL LLC MEMBERSHIP INTERESTS OR ASSETS.**

At such time as WPSL is sold the proceeds of the sale shall be distributed as follows:

A.      First: to any outstanding indebtedness owing by WPSL to any third party creditors;

B.      Second: to any expenses of the sale of WPSL;

C.      Third: to Prime all amounts due Prime to pay in full any Promissory Note, now or later existing, from Robert Kattula, Waste Path Sanitary Landfill, LLC, Bluegrass Incineration Services, LLC, U.S. Environmental Management, LLC, K & B Capital, LLC, Robert Kattula, Individually, or any entity affiliated with Bob Kattula or the above entities (not *to* includeing a certain $1,250,000.00 Promissory Note executed by K & B Capital, LLC and Robert Kattula dated 9/30/02, as amended, in favor of Prime);

D.      Fourth: to Prime, all amounts that are due, or would have been due, under any assigned notes of Robert Kattula, Waste Path Sanitary Landfill, LLC, Bluegrass Incineration Services, LLC, U.S. Environmental Management, LLC, K & B Capital, LLC, Robert Kattula, Individually, or any entity affiliated with Robert Kattula or the above entities;

E.      Fifth: the remaining net proceeds of the sale shall be split as follows:

(1)      If the proceeds from the sale are $10,000,000.00 or less CP's share of the profits (90%) shall be split as

89

follows:

Calvert Properties shall retain - 50%

Robert Kattula, or his assigns - 50%

(2)    If the proceeds from the sale are greater th[a]n $10,000,000.00 but less than $20,000,000.00 the first $10,000,000.00 shall be split as is set forth in Section 1 above, and the remainder distributed to CP shall be split as follows:

Calvert Properties shall retain - 25%

Robert Kattula or his assigns - 75%

(3)    If the proceeds from the sale are greater than $20,000,00[0].00, CP's share of the profits in excess of $20,000,000.00 shall he split as follows:

Calvert Properties shall retain - 50%

Robert Kattula- 50%

Calvert Properties, LLC, a Kentucky Limited Liability Company

By:   _____

Aaron J. Jade, President    Robert Kattula, Individually

Kattula made the handwritten notations on the MOU, before the parties signed it, that

*included*, rather than excluded, the Luna Pier loan in Sections I.1.C and II.C of the MOU.[202]

---

[202]  Jade (Tr. at Docket # 695) at 88-89; Jade (Tr. at Docket # 709) at 28-29.

These notations made by Kattula in the MOU meant that distributions made under those sections of the MOU would include any payments to Prime necessary to bring current the Luna Pier loan.

There is nothing in the MOU or any of the MOU transaction documents saying or suggesting that the Luna Pier loan was paid off, paid down, or discharged in whole or in part, by the MOU transaction.[203]  The Court finds that it was not.  Nor was any credible evidence presented of any other oral or written agreement of any kind, by Prime on the one hand, and Kattula or any Kattula-related entity on the other hand, reducing or eliminating the Luna Pier loan debt.  The Court finds that there was no such agreement.[204]

The Debtor argues, however, that under the five-tiers in Section I of the MOU and a proper accounting of Waste Path's revenue and expenditures for the years 2006 through 2012, more than enough money should have been credited to pay off not only the Luna Pier loan, but also the other loan debts that were owed to Prime by Kattula and the Kattula-related entities.

For these years (through 2012), Prime presented substantial, credible testimony that the revenue of Waste Path was never sufficient to pay anything beyond Tier 3 of the MOU, let alone Tier 5.  And as to Tier 3, the only payments that could be made on the Luna Pier loan were made, and were credited against the Luna Pier loan, in 2006 and 2007.  As stated in Part III.E.1.b.i of this Opinion, those credits totaled $302,744.00 in 2006 and $97,410.71 in 2007, for a total of $400,154.71 in such credits.  Prime's evidence supporting these points, all of which the Court finds to be credible and persuasive, includes the testimony of Dan Sills, who is the managing

---

[203]  Jade (Tr. at Docket # 721) at 38-39.  The Debtor has pointed to no such language in any of the MOU transaction documents.

[204]  The May 15, 2006 Escrow Agreement was not such an agreement.  The Court so finds, regardless of which of the disputed versions of that agreement is authentic.  (*Compare* PX-95, 99, 100, and 101 *with* DX-K and DX-O).

member and controller of Waste Path;[205] and the testimony of Aaron Jade, Prime's President and sole owner.[206]

In further support of its theory that all the loans owing to Prime have been paid in full, the Debtor presented testimony and a report from its retained accounting expert, Seymour Adler.[207] Adler did not analyze or opine about whether Waste Path revenue was correctly allocated and credited under the five distribution tiers of the MOU.[208] But Adler opined that under a proper accounting, all of the loans owing by Kattula and the Kattula-related entities to Prime were paid in full, by 2008 or 2009.[209]

Prime presented a comprehensive rebuttal to the Debtor's expert, in the form of the testimony and report from Prime's retained accounting expert, Gerald Gabriel.[210] Having considered the testimony of these competing experts, the Court finds the testimony and conclusions of Prime's expert, Gabriel, to be much more persuasive than that of the Debtor's expert, Adler. Gabriel's testimony strongly supports Prime's position about the MOU, and about the amounts owing on the various loans at issue. Gabriel's testimony strongly undermines the

---

[205]  Sills (Tr. at Docket # 439) at 69-71, 80-81; Sills (Tr. at Docket # 445) at 70-72; Sills (Tr. at Docket # 491) at 43-45, 74-75; Sills (Tr. at Docket # 422) at 55.

[206]  *See* Jade (Tr. at Docket # 709) at 84, 85; Jade (Tr. at Docket # 721) at 50-51.

[207]  The transcripts of Mr. Adler's testimony are filed at Docket ## 806, 811, 819, 830, 836, 844, and 860. Mr. Adler's report and its related exhibits were admitted into evidence, as DX-AAA and DX-BBB.

[208]  Adler (Tr. at Docket # 819) at 27-28.

[209]  *See, e.g.*, DX-BBB (Adler report) at p. 4; Adler (Tr. at Docket # 806) at 37.

[210]  The transcripts of Mr. Gabriel's testimony are filed at Docket ## 860, 870, 875, and 881. . Mr. Gabriel's report and most of its related exhibits were admitted into evidence, as PX-236 through PX-241, and PX-245, PX-247, and PX-248.

Debtor's theory based on Adler's testimony. Gabriel's conclusions include the following:

> Q  And were you able to form a conclusion and opinion regarding
> the outstanding balance owed to Prime Financial by Mr. Kattula
> and any of his entities as of the petition date in this case?
>
> A  Yes.  As of the petition date, October 21st, 2009, Prime
> Financial was owed $483,376.53 on the K & B Plus loan as shown
> on Exhibit 238. It was owed $241,688.30 on the Waste Path 2 loan
> as shown on Exhibit 238. And it was owed $1,352,453.22 on the
> Luna Pier loan as shown on Exhibit 240.[211]

In Exhibit 238, Gabriel also concluded that the balance owing on the loans other than the

Luna Pier loan as of October 31, 2012 was $509,549.05.[212]  In Exhibit 240, Gabriel also

concluded that the balance owing on the Luna Pier loan as of October 31, 2012 was

$1,892,918.95.[213]

With one possible, minor exception, the Court agrees with these conclusions by Gabriel.

The one possible exception concerns the balance owing on the Luna Pier loan as of the October

1, 2009 petition date.  The Court has found, in Part III.E.1.b.i of this Opinion, that the debt owing

on the Luna Pier loan as of the petition date in this case was $1,325,664.47, plus possible real

estate tax reimbursements and legal fees that Prime claims are owing on this loan.  And this

difference from Gabriel's number as of the petition date would also affect the balance of the

Luna Pier that was still owing as of October 31, 2012.  (But in any event, there is no evidence

that there were any payments or credits due or made on the Luna Pier loan after the petition date

in this case).

---

[211]  Gabriel (Tr. at Docket # 875) at 12.

[212]  PX 238 at p. 3 ($339,699.31 on the K & B Plus loan, plus $169,849.74 on the Waste Path II
loan); *see also* Gabriel (Tr. at Docket # 875) at 12.

[213]  PX-240 at p. 3.

The opinions by the Debtor's expert, Adler, were based on numerous underpinnings. Without discussing each and every one of these underpinnings in this Opinion, the Court finds that all of these underpinnings were persuasively rebutted by the testimony and report from Prime's expert, Gabriel.[214] And several of the major arguments underpinning Adler's opinions are discussed at length, and rejected, elsewhere in this Opinion.[215]

## 4. The Debtor's reliance on the "BLX Letter"

In support of its assertion that the Luna Pier loan was paid off, the Debtor relies on a letter (the "BLX Letter") signed by Prime's Jade dated November 15, 2005, addressed and sent to Business Loan Express, a company from which Kattula was then trying to obtain a loan. Prime admits that its President Jade signed this letter, and that Kattula sent this letter to Business Loan Express, with Jade's permission, all at the request of Kattula. The language for the letter was supplied by Kattula, and Kattula asked Jade to prepare and sign the letter. Kattula also asked for Jade's permission to send a copy of the signed letter to Business Loan Express, and Jade agreed to that.[216]

The BLX Letter stated:

---

[214] This includes, without limitation, the Debtor's usury argument. (Debtor's closing brief (Docket # 892) at 12-13; Prime's closing brief (Docket # 904) at 24).

[215] These include the Debtor's arguments that the foreclosure sale price of the Luna Pier property was substantially less than the value of that property; and the Debtor's argument about the Kentucky closure fund. These arguments are discussed and rejected in Parts III.E.1.b.ii and III.E.5 of this Opinion.

[216] Kattula (Tr. at Docket # 653) at 43-44; PX-30; Simovski (Tr. at Docket # 617) at 123; *see also* Levy (Tr. at Docket # 414) at 100. Kattula testified that Business Loan Express supplied the language for this letter, and Kattula sent Jade the language in an e-mail dated November 15, 2005. (Kattula (Tr. at Docket # 653) at 43-44; PX-30). Jade testified the same way, and admitted that after he signed the letter he gave Kattula a copy of it, and gave Kattula permission to fax the letter out. (Jade (Tr. at Docket # 721) at 61-62, 64-65; Jade (Tr. at Docket # 755) at 73-74.

Prime Financial, Inc. ("Prime") has received the money for Luna Pier Truck Depot mortgage from K & B Capital and TAJ Graphics Enterprises, L.L.C. However, the mortgage is in effect because it is cross collateralized with other loans that the Kattula's have with Prime in Kentucky.

Prime will subordinate its mortgage up to $3,800,000.00 in favor of Business Loan Express and it will not be receiving any payment from Luna Pier with respect to the Kentucky mortgages.

I expect that the Kentucky entities will pay a substantial amount down on their obligation on or before, January 3, 2006 and Prime will then terminate the mortgage that is currently held by Prime on Luna Pier.[217]

In the context in which the first sentence appears in this letter, it clearly is a written statement by Prime that the Luna Pier loan had been paid off, by payments from K&B and the Debtor.[218] Jade testified that he does not interpret the letter to say this,[219] but his contrary reading of the letter is plainly unreasonable and wrong.

But Prime very much disputes that the Luna Pier loan was ever in fact paid off, as discussed above. The Court finds that the BLX Letter was false when Jade signed it and Kattula sent it to Business Loan Express, because the Luna Pier loan was not in fact paid off at that time (or ever), and that both Jade and Kattula knew that.

Both before and after the date of the November 15, 2005 BLX Letter, Kattula himself

---

[217] PX-48. Another copy of this letter was admitted into evidence as PX-15. The only difference between the two exhibits is that PX-15 has the fax number identification for Prime at the top of it. (Levy (Tr. at Docket # 414) at 99-100).

[218] Peter Schneiderman, the lead attorney who represented Prime in drafting and closing all the loan transactions between Prime and Kattula and his entities, testified that he could not recall having written this letter to Business Loan Express (PX-48), and then later testified that he had never seen or heard of that letter until the present litigation began. But he agreed that this letter does say that the Luna Pier debt is paid. (Schneiderman (Tr. at Docket # 377) at 71-72 and (Tr. at Docket # 390) at 92).

[219] *See* Jade (Tr. at Docket # 695) at 90-91; Jade (Tr. at Docket # 721) at 65.

95

acknowledged and admitted, several times and in a number of ways, that the Luna Pier loan was *not* paid off. For example, on May 10, 2005, Kattula signed an agreement with Prime entitled "Agreement to Extend Promissory Notes," in which Kattula, K&B, and other Kattula-related entities agreed with Prime to extend the maturity dates of a number of notes payable to Prime, including the $1.25 million Luna Pier note. The agreement extended the maturity date of the Luna Pier note from May 30, 2004 to December 31, 2005.[220]

Several times, on dates well after the November 15, 2005 BLX Letter, Prime's attorneys sent Kattula a notice of default regarding the Luna Pier loan, clearly indicating that the loan was still due and that K&B and Kattula were in default on that loan. These included a notice of default on April 1, 2006 (stating that the balance owing on the loan was $1,503,425,04);[221] and a notice of default on December 14, 2006 that included the Luna Pier loan and other loans in default;[222] and Kattula never responded to these default notices by claiming that the Luna Pier loan was paid off.[223]

One very telling fact is that the BLX letter was written and sent to BLX on the day before Kattula and Jade signed the MOU on November 16, 2005. As noted above, on that day, it was Kattula who made the handwritten notations on the MOU, before the parties signed it, that included the Luna Pier loan in Sections I.1.C and II.C of the MOU. As discussed above, these notations made by Kattula in the MOU meant that Tier 3 distributions under the MOU would

---

[220] PX-43; Levy (Tr. at Docket # 414) at 42-45.

[221] PX-23; Levy (Tr. at Docket # 414) at 45-46.

[222] PX-25; Levy (Tr. at Docket # 414) at 47-48.

[223] Levy (Tr. at Docket # 414) at 50-51.

96

include any payments necessary to bring current the Luna Pier loan. These notations in the MOU would have been totally unnecessary, and would have made no sense, if the Luna Pier loan had been paid off on or before the day before the MOU was signed.[224] These notations that Kattula made in the MOU on November 16, 2005, the day after the BLX Letter, clearly show that the Luna Pier loan was *not* paid off, and that Kattula very well knew that.

Kattula admitted in his testimony that as of October 31, 2005, the Luna Pier loan was not paid off.[225] Kattula further testified, based on e-mails he sent to Jade on October 31, 2005 and November 14, 2005 (PX-49 and PX-50), that as part of the upcoming MOU transaction, the Luna Pier loan was to be paid off from the Kentucky closure funds.[226] These e-mails actually do not support Kattula's assertion.[227] But even if they did, Kattula and the Debtor have cited nothing that says this, in the MOU or in any of the many MOU transaction documents, all of which were executed after the dates of the foregoing Kattula e-mails, on November 16, 2005. The Court does not find that any of these MOU-related documents says anything of the kind. Rather, as

---

[224]  *See* Levy (Tr. at Docket # 414) at 101-02.

[225]  Kattula (Tr. at Docket # 633) at 22-23 (discussing PX-49).

[226]  Kattula (Tr. at Docket # 633) at 23-24, 35.

[227]  In the October 31, 2005 e-mail (PX-49), says that the "[$]1,250,000 (Luna Pier note) will be paid from K&B recovery of closure money **or other asset**. **The [$]1,250,000 will be paid by selling or financing Luna Pier.**" (Emphasis added). This statement is internally inconsistent. The bolded language indicates that the Luna Pier loan would *not* be paid from K&B's recovery of the closure money. Moreover, under the MOU transaction documents later executed on November 16, 2005, Kattula and K&B gave up any legal right they may have had to recover the Kentucky closure fund. *See* discussion below.

In his November 14, 2005 e-mail (PX-50), Kattula merely promises to pay the Luna Pier loan off by December 31, 2005. After discussing his proposed terms for the later-executed MOU transaction, Kattula states: "After we agree to these terms and conditions there will be left only two notes payable to Prime from K&B Capital/RTK: Note A $1,250,000 (will be paid on or before Dec 31, 2005)."

discussed above, the MOU itself contains hand-written provisions put in by Kattula himself, indicating that any payments under Tier 3 of the MOU would be used, in part, to bring current the Luna Pier loan. That is plainly inconsistent with Kattula's unsupported allegation that the Luna Pier loan was to be deemed paid off by application of the Kentucky closure funds to that debt. (The Kentucky closure fund is discussed in more detail below).

Finally, several other documents in evidence show implicit, but clear, admissions made by Kattula, well after the date of the November 15, 2005 BLX Letter, and after the date of the November 16, 2005 MOU transaction, that the Luna Pier loan was not paid off.[228]

As stated above, the statement in the BLX Letter indicating that the Luna Pier loan had been paid off was not true, and Kattula and Jade both knew that at the time of the letter. But the letter cannot form any basis for this Court to impose any sort of estoppel against Prime, to preclude Prime from denying that the Luna Pier loan was paid off. Nor does the Debtor argue for any such estoppel. The BLX Letter could not be the basis of any estoppel in favor of the Debtor, Kattula, or K&B, because Kattula knew that the Luna Pier loan was not paid off when he induced Jade to sign the letter. So the Debtor, Kattula, and K&B did not *actually* rely, and could not be deemed to have *justifiably* relied, in any way, on the indication in the BLX Letter that the Luna Pier loan was paid off. So the Debtor, Kattula, and K&B could not succeed on any sort of estoppel-type argument. *See Van v. Zahorik*, 597 N.W.2d 15, 22 (Mich. 1999).[229]

---

[228] *See* PX-161 (e-mail dated March 15, 2006 from Simovski "sent on behalf of" Kattula to Jade, at ¶¶ 2,3) (stating that after the MOU transaction, "the amount owed to Prime Financial equals $3,125,000"); PX-164 (financial statement of Robert and Maria Kattula "as of January 2006" and signed bu Kattula on June 15, 2006, listing liability to Prime of $4,672,260); Simovski (Tr. at Docket # 617) at 83, 85-86 (regarding PX-161), 86-87 (regarding PX-164).

[229] In *Van v. Zahorik*, the Michigan Supreme Court stated the elements of equitable estoppel in this way:

And for that matter, the recipient of the BLX Letter, Business Loan Express, never actually relied on that letter in any way to its detriment. It is undisputed that Business Loan Express never actually made any loan to Kattula or K&B. So no estoppel could lie in favor of Business Loan Express and against Prime either.

**5. The Kentucky "closure fund"**

The Debtor argues, as a defense to Prime's claim, that the Debtor is entitled to payment of the amount of certain funds that Waste Path has on deposit with the State of Kentucky, which the Court will refer to as the "Kentucky closure fund" or the "closure fund." But the Court rejects the Debtor's argument about the closure fund, for the reasons stated below.

In order to conduct its landfill operation under Kentucky law, Waste Path was required to make a security deposit with the State of Kentucky, through the State's agency known as the Environmental Protection Cabinet. The deposit is commonly referred to as a closure fund, because its purpose is to provide security for the cost of properly closing a landfill site, when that landfill gets full and thereby reaches the end of its useful life. The amount of the closure fund that Waste Path has had on deposit with the State of Kentucky has varied over the years, but at the time relevant to this discussion, the amount was $1.278 million.[230] Subject to the rights of the State of Kentucky, the owner of all of the rights to the closure fund was Waste Path. K&B had

_____

> Equitable estoppel arises where a party, by representations, admissions, or silence intentionally or negligently induces another party to believe facts, the other party justifiably relies and acts on that belief, and the other party will be prejudiced if the first party is allowed to deny the existence of those facts.

597 N.W.2d at 22 (citation omitted). *See also NL Ventures VI Farmington, LLC v. City of Livonia*, 886 N.W.2d 772, 783 (Mich. Ct. App. 2015) (same).

[230] *See* PX-87 (page immediately following the document entitled "Escrow Agreement").

purchased, at a bankruptcy sale, the assets of the Kentucky landfill that Waste Path later

operated, and K&B assigned and transferred those assets to Waste Path, in a document entitled

"Assignment and Assumption Agreement," dated March 24, 2004.[231] The assets transferred to

Waste Path included the rights in the closure fund.[232] And in an e-mail dated March 15, 2006,

Kattula acknowledged that the assets of Waste Path included the closure fund.[233]

The Debtor's defense relating to the Kentucky closure fund is based on an agreement that

was signed on September 9, 2004, entitled "Purchase Agreement for Membership Rights of

Waste Path Sanitary Landfill, LLC" (the "September 9, 2004 Agreement").[234] The parties to this

agreement were K&B, as seller on the one hand, and Dan Sills and Joy Hubb, as buyers on the

other hand. Just before this agreement was made, K&B purportedly was the 100% member of

Waste Path. By this agreement, K&B sold its entire membership interest in Waste Path to Dan

Sills and Joy Hubb, each of whom was sold a 50% membership interest in Waste Path. The sale

price was $3 million.[235]

The September 9, 2004 Agreement contained two provisions regarding payment of the $3

million purchase price to be paid to K&B, and was supplemented by a promissory note. First, the

agreement provided that Sills and Hubb were to pay $2 million to K&B no later than December

---

[231] PX-115.

[232] *See id.* at 2, ¶¶ 1, 2 (assignment to Waste Path included "all permits, and operational licenses issued by the Kentucky Environmental Protection Cabinet" and "all assets associated with the sanitary landfill operation . . . including all real property and personal property, . . ..")

[233] PX-161, item 10 ("Wastepath's assets consist of closure money ($1.4M) . . ..")

[234] PX-87, first four pages.

[235] *Id.* at 1, ¶¶ 1, 2.

31, 2004.[236]  Second, the agreement contained a provision stating that Sills and Hubb were to

"substitute the current closure funds" no later than December 31, 2004, such that the amount of

the closure fund then on deposit with the State would be paid to K&B as part of the indebtedness

of Sills and Hubb for the $3 million purchase price of the Waste Path membership interests.

Specifically, this provision stated:

> The buyer shall substitute the current closure funds, which are
> pledged to the Commonwealth of Kentucky Environmental
> Protection Cabinet.  Said substitute closure funds shall be
> presented to the Environmental Protection Cabinet on or before
> December 31st, 2004.  Any substitute closure funds shall be
> applied to the outstanding balance owed on the indebtedness
> referred to herein.[237]

As part of the September 9, 2004 transaction, the seller of the Waste Path membership

shares, K&B, made a loan to Sills, Hubb, and Waste Path, to finance the $3 million purchase

price.  And Sills and Hubb caused Waste Path to give a $3 million promissory note, payable to

K&B, for the $3 million purchase price of the Waste Path membership shares (the "September 9,

2004 Promissory Note").[238]  In this way, Waste Path would pay the $3 million purchase price,

plus interest, to the extent the purchase price was not otherwise paid by Sills and Hubb under the

September 9, 2004 Agreement.  The promissory note required Waste Path to pay interest at 12%

per annum, and to make interest payments of $30,000 per month, beginning October 1, 2004,

with a balloon payment of the entire balance then owing on December 31, 2005.[239]  K&B's $3

---

[236]  *Id.* at 3, ¶ 6(e).

[237]  *Id.* at 3, ¶ 6(d).

[238]  PX-87, fifth page ("Promissory Note").

[239]  *Id.* (Promissory Note at 1).

million loan to Sills, Hubb, and Waste Path was secured by, among other things, a pledge Sills and Hubb made of their newly-acquired membership shares in Waste Path.[240]

But there were major problems with the September 9, 2004 transaction. When Sills and Hubb purchased the membership shares of Waste Path from K&B on September 9, 2004, they did not know that those shares were encumbered. The shares had already been pledged by Kattula to Prime, as part of the collateral securing the Waste Path I loan. That was a $600,000 loan that Prime made in May 2004 to Kattula, K&B, Waste Path, and other Kattula-related parties.[241] At the time of the loan, Kattula owned the 100% membership interest in Waste Path, and he pledged that membership interest to Prime as collateral for the Waste Path I loan, in a security agreement dated May 13, 2004, entitled "Security and Pledge Agreement."[242] Prime had never released that collateral. So when Sills and Hubb bought the membership shares on September 9, 2004, the shares were encumbered by Prime's lien. Kattula knew this, but he did not tell Sills and Hubb. Rather, Kattula actually caused K&B to make a written representation to Sills and Hubb, in the September 9, 2004 Agreement, that the membership shares were "free and clear of all liens and encumbrances of every kind and nature."[243] Sills and Hubb did not learn of the prior pledge of the membership shares to Prime until October 25, 2005.[244]

A further problem is that Kattula did not tell anyone at Prime about the September 9,

---

[240] PX-87 (document entitled "Security and Pledge Agreement" dated September 9, 2004).

[241] The loan documents for the Waste Path I loan are contained in PX-76.

[242] This security agreement is contained in PX-76. (*See also* Schneiderman (Tr. at Docket # 367) at 51-52).

[243] PX-87, Purchase Agreement at 2, ¶ 5.

[244] Sills (Tr. at Docket # 439) at 37-38, 77-78.

2004 sale of the Waste Path membership shares to Sills and Hubb. (Jade and Prime did not learn of this until October 26, 2005, more than a year later.)[245] This sale of Prime's collateral, without Prime's consent, was a breach of, and an event of default under, the Waste Path I loan documents, including Kattula's security agreement with Prime.[246] When it became known to Prime on October 26, 2005, Kattula's conduct in secretly engaging in the September 9, 2004 transaction was one of the things that led to the restructuring by the MOU transaction, in November 2005.

The Debtor claims that there was a breach of the September 9, 2004 Agreement's requirement that Sills and Hubb "substitute" the Kentucky closure fund, and pay the amount of that fund to K&B by December 31, 2004. It is undisputed that this "substitution" and payment never occurred. The Debtor asserts that it is the owner of the resulting breach of contract claim, because K&B assigned that claim to the Debtor.[247]

There are at least two fatal flaws in the Debtor's argument about the Kentucky closure fund. First, there is, and never was, any obligation *on the part of Prime* to "substitute" and pay the closure fund to K&B (or to the Debtor, as K&B's purported successor-in-interest). Under the September 9, 2004 Agreement, which Prime did not even learn about until October 2005, the only parties who were obligated to "substitute" and pay the closure fund amount were Dan Sills

---

[245] Jade (Tr. at Docket # 695) at 27-28, 52, 55-56; Schneiderman (Tr. at Docket # 377) at 12-13, 55. Kattula testified that Prime knew about and consented to the September 9, 2004 sale of membership interests. (*See* Kattula (Tr. at Docket # 653) at 54.) But this testimony is not credible; the Court does not believe it.

[246] Schneiderman (Tr. at Docket # 367) at 52.

[247] The Debtor says that K&B made this assignment of the claim to the Debtor under (1) the October 1, 2004 Assignment document discussed in Part III.D.1.a of this Opinion (DX-A); and (2) an assignment dated June 1, 2006 (PX-182; Kattula (Tr. at Docket # 643) at 57-58).

and Joy Hubb.  The Debtor has not proven any valid legal theory by which Prime could be found liable on this obligation.

Second, this obligation of Sills and Hubb under the September 9, 2004 Agreement was *cancelled*, as part of the MOU transaction that was done in November 2005.  The obligation to "substitute" and pay to K&B the amount of the closure fund was part of the obligation of Sills and Hubb to pay the $3 million purchase price for their Waste Path membership shares.  That entire payment obligation was cancelled as part of the MOU transaction.  In the MOU transaction, Sills and Hubb were each given a 5% membership interest in Waste Path, and the other 90% membership interest was given to Calvert Properties, LLC (which is 100% owned by Jade, the 100% owner of Prime).  And the obligation of Sills and Hubb (and Waste Path) to pay the $3 million to K&B was cancelled.[248]

Other than the inapplicable, and cancelled, obligation under the September 9, 2004 Agreement, there is no colorable basis for the Debtor's defense relating to the Kentucky closure fund.  There is nothing in the MOU or any of the MOU transaction documents saying or suggesting that the Luna Pier loan was to be paid  paid off, paid down, or discharged in whole or in part, by the closure fund.[249]  Rather, the contrary is clearly true.  Nor is there anything in the MOU or any of the MOU transaction documents saying that Prime owed any obligation to pay any part of the amount of the Kentucky closure fund to the Debtor, Kattula, K&B, or any Kattula-related entity.

---

[248]  PX-84, Tab 13 (document entitled "Cancellation of Promissory Note and Security Documents" dated November 16, 2005, signed by K&B, Sills, and Hubb).

[249]  Jade (Tr. at Docket # 721) at 38-39.  The Debtor has pointed to no such language in any of the MOU transaction documents.

Nor was any credible evidence presented of any *other* such agreement of any kind, oral or written, between Prime, Jade, or any Prime-related entity on the one hand, and the Debtor, Kattula or any Kattula-related entity on the other hand. The Court finds that there was no such agreement.

## 6. Summary

Except with respect to the amount paid to Prime in the October 4, 2004 wire transfer, discussed in Part III.D.2 of this Opinion, the Debtor has failed to prove, under any theory or allegation made at any time during the very long evidentiary hearing held in this case, that the Debtor's debt to Prime under the confirmed 2004 Plan has been paid, or should be deemed to have been paid, in any amount.

## IV. Conclusion

For the reasons stated in this Opinion, the Court will enter an order sustaining the Debtor's Claim Objection in part, and overruling it in part, and ordering that Prime has an allowed, non-priority, unsecured claim in this bankruptcy case in the reduced amount of $1,356,044.45.

**Signed on April 19, 2019**



/s/ Thomas J. Tucker
**Thomas J. Tucker**
**United States Bankruptcy Judge**